[No. C007044. Third Dist. Nov. 20, 1992.]

COLGATE-PALMOLIVE COMPANY, INC., Plaintiff and Respondent, v. FRANCHISE TAX BOARD, Defendant and Appellant.

**COUNSEL**

John K. Van de Kamp and Daniel E. Lungren, Attorneys General, Robert F. Tyler and John D. Schell, Deputy Attorneys General, and Eric J. Coffill for Defendant and Appellant.

Morrison & Foerster, Franklin C. Latcham, James P. Kleier and Clare M. Rathbone for Plaintiff and Respondent.

**OPINION**

**DAVIS, J.**—The principal issue in this appeal is whether California's worldwide unitary method of taxation (based on Rev. & Tax. Code, §§ 25101, 25120-25139), as applied to domestic-parent unitary corporate groups, is unconstitutional under the foreign commerce clause of the United States Constitution. (U.S. Const., art. I, § 8, cl. 3.)[1] Using the dormant foreign commerce clause analytical framework set forth in *Japan Line, Ltd.* v.

---

[1]During the tax years at issue (1970-1973), Revenue and Taxation Code section 25101 provided in pertinent part: "When the income of a taxpayer subject to the tax imposed under this part is derived from or attributable to sources both within and without the state the tax shall be measured by the net income derived from or attributable to sources within this state

*County of Los Angeles* (1979) 441 U.S. 434 [60 L.Ed.2d 336, 99 S.Ct. 1813] and *Container Corp.* v. *Franchise Tax Bd.* (1983) 463 U.S. 159 [77 L.Ed.2d 545, 103 S.Ct. 2933], we originally concluded that the tax method does not violate that clause. Several months after we issued our decision, the California Supreme Court issued its decision in *Barclays Bank Internat., Ltd.* v. *Franchise Tax Bd.* (1992) 2 Cal.4th 708 [8 Cal.Rptr.2d 31, 829 P.2d 279] *(Barclays)*. On June 18, 1992, the Supreme Court directed us to vacate our original decision in this case and refile it after modification in light of *Barclays*. The parties then filed supplemental briefs. As we explain, *Barclays* effects a substantial change in our foreign commerce clause analysis but no change in our original result. Consequently, we still reverse that part of the judgment regarding the foreign commerce clause issue and affirm that part of the judgment regarding the statutory and constitutional distortion issues.

## BACKGROUND

### *The Methods of Allocating Income*

When a corporation, either on its own or through subsidiaries, conducts business across state or national boundaries, the allocation of income to each relevant jurisdiction for purposes of taxation becomes an issue. To resolve this issue, two general methods of income allocation have been created: the arm's length/separate accounting method and the unitary business/formula apportionment method. Each of these two general methods can be applied in varying ways. (*Container Corp.* v. *Franchise Tax Bd., supra*, 463 U.S. at pp. 182, 191, 196 [77 L.Ed.2d at pp. 564, 570, 573]; Langbein (1986) 23 Tax Notes 625, 626; Note, *State Worldwide Unitary Taxation: The Foreign Parent Case* (1985) 23 Colum. J. of Transnat'l L. 445, 451, hereafter 23 Columbia Journal.)

■ Under separate accounting, the related corporations of a multijurisdictional enterprise are viewed as distinct from one another; taxable income is determined separately for each individual corporation by the jurisdiction in which that corporation actually conducts business or has a permanent establishment. Any improper shifting of value between the related corporations to avoid taxes is corrected by requiring "arm's length" pricing in

in accordance with the provisions of Article 2 (commencing with Section 25120 of this chapter); . . ."

California's version of the Uniform Division of Income for Tax Purposes Act (UDITPA), is contained in article 2. That act provides for formula apportionment of the net income from business activities both within and outside California in order to reach the net income attributable to California activities. (Rev. & Tax. Code, §§ 25120-25139.)

In 1982, section 25101 was amended in a manner insignificant to our purposes. (Stats. 1982, ch. 466, § 104, p. 2055.)

related corporate transactions. In other words, the related corporations must act as if they were unrelated entities dealing at arm's length in the market-place.

■ In contrast, under the unitary business/formula apportionment method of allocating income at issue in this case—the worldwide unitary method—the related corporations of a multijurisdictional enterprise are treated as units of a single business—that is, as a "unitary group." (Cal. Code Regs., tit. 18, § 25137-6.)[2] If a corporation doing business in California is deemed to be part of a unitary group, the total income for that group worldwide, including corporations operating wholly outside the United States, is apportioned to California by a three-factor formula. Under the formula, the property, payroll, and sales figures for the group in California are arithmetically compared to the property, payroll, and sales figures for the group worldwide. (See Rev. & Tax. Code, §§ 25128-25136.) This compari-son results in a proportion that is multiplied against the unitary group's worldwide income, producing an apportioned amount of such income tax-able by California.[3] Simply put, if 25 percent of the property, payroll, and sales of the unitary group is located in California, then 25 percent of the group's worldwide income is apportioned to California. Under this method, it is unnecessary to make "arm's length" corrections because intercorporate transactions are disregarded.

Aside from a few minor exceptions, the income allocation method used by the United States and all of the other nations of the world is the separate accounting method, although, as noted, this method varies in practice. However, the United States has basically limited the application of its tax treaties to federal taxes. (*Container Corp.* v. *Franchise Tax Bd., supra*, 463 U.S. at p. 196 [77 L.Ed.2d at p. 573].)[4]

---

[2]Generally, a corporation is included within the unitary group if its activities outside California are dependent upon or contribute to the business of a related corporation within California. (See *Edison California Stores* v. *McColgan* (1947) 30 Cal.2d 472 [183 P.2d 16].)

[3]The amount of the unitary group's income taxable by California is calculated as follows:

$$\left( \frac{\text{In-state Property}}{\text{Total Property}} + \frac{\text{In-state Payroll}}{\text{Total Payroll}} + \frac{\text{In-state Sales}}{\text{Total Sales}} \right) \div 3 \quad \text{x} \quad \text{Total Corporate Income} = \text{Income Taxable by the state}$$

(Rev. & Tax. Code, §§ 25128-25137; 23 Colum. J., *supra*, at p. 445, fn. 2.)

[4]California in 1986 passed legislation, effective January 1, 1988, permitting taxpayers to make a "water's-edge election" notwithstanding Revenue and Taxation Code section 25101 (Rev. & Tax. Code, § 25110 et seq.).

This "water's-edge" method restricts tax allocation methods to the United States as the jurisdictional boundary, and offers an alternative to the worldwide unitary method for

The present controversy involves Colgate-Palmolive Company, Inc. (Colgate), a domestic-parent unitary corporate group with approximately 75 foreign subsidiaries operating in about 54 foreign counties.[5] Colgate was directed to pay additional taxes for the years 1970 through 1973 after California applied the worldwide unitary tax method to the group. Under protest, Colgate paid the additional taxes and this suit ensued.

*The Issues on Appeal*

At trial, Colgate challenged the federal constitutionality of these additional taxes on foreign commerce clause grounds. The thrust of Colgate's argument below was that the federal executive branch acted decisively after

determining taxable income. (See Rev. & Tax. Code, §§ 25101, 25110.) Rather than accounting for the income and apportionment factors (property, payroll, and sales) of all the corporations of its worldwide unitary group, a corporate taxpayer making such an election accounts for the income and apportionment factors of the following entities affiliated with it, subject to some minor exceptions: corporations incorporated in the United States; any corporation, wherever incorporated, if the average of its apportionment factors within the United States is 20 percent or more; affiliated corporations which are eligible to be included in a federal consolidated tax return; domestic international sales corporations and foreign sales corporations engaged in sales in the United States; export trade corporations; any corporation not mentioned above but only to the extent of income derived from or attributable to sources within the United States; and any affiliated corporation which is a controlled foreign corporation as defined in the Internal Revenue Code. Any corporation not subjected to the worldwide unitary method under Revenue and Taxation Code section 25101 need not be included in this "water's-edge" accounting. (Rev. & Tax. Code, § 25110, subd. (a).)

In general, this election permits a taxpayer corporation to exclude the income and apportionment factors of foreign subsidiaries from the corporation's California tax base. An accounting restriction to the water's edge of the United States in the present context would mean that California could rely only on income derived from permanent establishments of Colgate in the United States, and not on income derived from wholly foreign interests, to calculate Colgate's franchise tax.

To qualify for the "water's-edge" election, the corporate taxpayer must (1) consent to the taking of depositions from key corporate personnel and to the production of documents to ensure the Franchise Tax Board has the information necessary to make genuine arm's length adjustments and unitary business investigations, and (2) agree that dividends received by any affiliated entity from corporations significantly related to the unitary business constitute business income of the taxpayer. (Rev. & Tax. Code, § 25110, subd. (b)(2).) Additionally, to qualify the corporate taxpayer must enter into a five-year contract with the Franchise Tax Board, pay an annual fee, and subject itself to various conditions. (Rev. & Tax. Code, §§ 25111-25115.)

A domestic-parent multinational corporation that does not make this election is subjected essentially to the 1970-1973 taxation method at issue here. (See fn. 1, *ante*.) We emphasize, however, that the principal issue in this case is the foreign commerce clause constitutionality of California's worldwide unitary tax method as applied to domestic-parent unitary corporate groups with foreign subsidiaries (Rev. & Tax. Code, § 25101 et seq.). Because California's "water's-edge election" is not involved in this case, we do not express any views regarding it. (Rev. & Tax. Code, § 25110 et seq.)

[5]Reversing its position below, Colgate on appeal does not dispute that it is a domestic-parent unitary corporate group.

the *Container* decision to communicate its longstanding position that California's worldwide unitary tax method impermissibly interferes with American foreign policy; according to Colgate, this decisive action eliminated the factual ambiguity that resulted in the *Container* decision. The trial court agreed with this argument and determined that California's worldwide unitary tax method was unconstitutional on this ground. The Franchise Tax Board (the Board) appeals that decision here.

Colgate also argued at trial that California's three-factor unitary formula unlawfully "distorted" the amount of Colgate's income apportioned to California. The trial court found against Colgate on this issue, which Colgate again raises in its respondent's brief.[6]

Finally, two peripheral issues are raised by the Board in this appeal. First, the Board claims the trial court abused its discretion in denying the Board's motion for discovery sanctions. Secondly, the Board asserts the court below erroneously awarded certain costs to Colgate.

*The Foreign Commerce Clause*

■ Article I, section 8, clause 3 of the United States Constitution empowers Congress "To regulate commerce with foreign nations, and among the several states, and with the Indian tribes." As the United States Supreme Court has long emphasized, this clause limits the power of the states even in the absence of congressional legislation. (*Boston Stock Exchange* v. *State Tax Comm'n.* (1977) 429 U.S. 318, 328 [50 L.Ed.2d 514, 523, 97 S.Ct. 599]; *Freeman* v. *Hewit* (1946) 329 U.S. 249, 252 [91 L.Ed.2d 265, 271, 67 S.Ct. 274].) In this respect, the commerce clause indirectly allocates the relative powers of states and the federal government. (*Star-Kist Foods, Inc.* v. *County of Los Angeles* (1986) 42 Cal.3d 1, 9 [227 Cal.Rptr. 391, 719 P.2d 987].)

As noted in *Star-Kist*, "[d]etermining whether a state tax exceeds the bounds of permissible state action under the [commerce] clause is often a difficult task." (42 Cal.3d at p. 10.) In the context of the foreign commerce clause, there are three United States Supreme Court decisions that have delineated the test under which this determination is made: *Japan Line, Ltd.* v. *County of Los Angeles, supra,* 441 U.S. 434; *Container Corp.* v. *Franchise Tax Bd., supra,* 463 U.S. 159; and *Wardair Canada* v. *Florida Dept. of Revenue* (1986) 477 U.S. 1 [91 L.Ed.2d 1, 106 S.Ct. 2369].

Applying the foreign commerce clause test it created, the court in *Japan Line* held that instrumentalities of commerce—in that case, seagoing cargo

---

[6]The Board moved to strike this argument on appeal, contending it was improperly raised in these proceedings. We denied the Board's motion.

containers—which are foreign-owned, -based, and -registered and which are used solely in international commerce may not be subjected to a state's apportioned ad valorem property tax. (441 U.S. at pp. 436, 444 [60 L.Ed.2d at pp. 340, 345].)

In creating the foreign commerce clause test, the *Japan Line* court noted that the issue of taxation between nations is more complicated than the issue of taxation between American states. This increased complexity results from a number of factors, including the greater sensitivity to national as opposed to state sovereignty, the lack of an authoritative tribunal capable of resolving transnational disputes, and the fact that actions by individual states can work to the detriment of the whole country. (441 U.S. at pp. 447-451, 456 [60 L.Ed.2d at pp. 347-350. 352].) In light of these circumstances, said *Japan Line*, the foreign commerce power of Congress is greater than its interstate commerce power and the need for one national voice in regulating commercial relations with foreign nations is paramount. (*Id.* at pp. 448-449 [60 L.Ed.2d at pp. 347-348].)

From this comparison of the interstate and the foreign contexts, the foreign commerce clause test was born. That test was engendered by adding two inquiries onto the already existing four-part test for interstate commerce clause review. (*Japan Line, supra*, 441 U.S. at pp. 444-445, 451 [60 L.Ed.2d at pp. 345-346, 349-350].)

■ Under the four-part interstate test, a state tax will survive an interstate commerce clause challenge if the tax " '[i] is applied to an activity with a substantial nexus with the taxing State, [ii] is fairly apportioned, [iii] does not discriminate against interstate commerce, and [iv] is fairly related to the services provided by the State.' " (*Japan Line, supra*, 441 U.S. at pp. 444-445, 449, 454 [60 L.Ed.2d at pp. 345, 348, 352], quoting *Complete Auto Transit, Inc.* v. *Brady* (1977) 430 U.S. 274, 279 [51 L.Ed.2d 326, 331, 97 S.Ct. 1076].)

The two additional inquiries prompted by the foreign context are: first, whether the tax creates a "substantial risk of international multiple taxation" (441 U.S. at p. 451 [60 L.Ed.2d at p. 349]); and, second, whether the tax "may impair federal uniformity in an area where federal uniformity is essential" (*id.* at p. 448 [60 L.Ed.2d 347]), and prevents "the Federal Government from 'speaking with one voice when regulating commercial relations with foreign governments.' " (*Id.* at p. 451 [60 L.Ed.2d at p. 349], quoting *Michelin Tire Corp.* v. *Wages* (1976) 423 U.S. 276, 285 [46 L.Ed.2d 495, 503, 96 S.Ct. 535]; see also *Container, supra*, 463 U.S. at pp. 193-194 [77 L.Ed.2d at pp. 571-572].) If a state tax violates either of these precepts,

it is unconstitutional under the foreign commerce clause. (441 U.S. at p. 451 [60 L.Ed.2d at p. 349].)

Because the foreign commerce clause is self-executing, the judiciary applies this test when Congress or the federal government has not acted or purported to act. (*Merrion* v. *Jicarilla Apache Tribe* (1982) 455 U.S. 130, 154-155 [71 L.Ed.2d 21, 40-41, 102 S.Ct. 894]; *Wardair, supra,* 477 U.S. at pp. 7-8, 18 [91 L.Ed.2d at pp. 9-10, 16].) In such "dormant" foreign commerce clause situations, the judiciary must determine whether a particular state action unduly threatens the purpose of the clause: to ensure a unified national voice in foreign commerce matters raising inherently national concerns and to ensure that individual states do not work to the detriment of the whole nation. (*Ibid.*; see also *Japan Line, supra,* 441 U.S. at pp. 448-449 [60 L.Ed.2d at pp. 347-348].)

In *Japan Line,* the state tax at issue was found to violate both of the additional foreign commerce clause considerations. Multiple taxation resulted because the foreign country involved, Japan, taxed the cargo containers at full value. (441 U.S. at pp. 451-452 [60 L.Ed.2d at pp. 349-350].) The "one-voice" standard was violated because the United States and Japan had signed a convention reflecting a national policy to preclude such taxes. Furthermore, American-owned cargo containers were not taxed in Japan; this created an asymmetry in international taxation disadvantageous to Japan and, under such circumstances, the risk of Japanese retaliation against the whole nation was substantial. Finally, if other states enacted their own taxing schemes, taxation would vary port by port, making speaking with one voice impossible. (*Id.* at pp. 452-453 [60 L.Ed.2d at pp. 350-351].)

That brings us to the decision in *Container Corp.* v. *Franchise Tax Bd., supra,* 463 U.S. 159. *Container* involved the precise issue presented here: the constitutionality under the foreign commerce clause of California's worldwide unitary tax method as applied to a domestic-parent unitary corporate group (hereafter, domestic-parent group) with foreign subsidiaries. (*Id.* at pp. 163, 171 [77 L.Ed.2d at pp. 551-552, 557].) Applying essentially the dormant foreign commerce clause test set forth in *Japan Line,* the court in *Container* held the tax method constitutional. (463 U.S. at pp. 185-197 [77 L.Ed.2d at pp. 566-574].)

In applying *Japan Line's* first additional foreign commerce clause consideration—the enhanced risk of international multiple taxation—*Container* noted that separate accounting did not inevitably end double taxation and California's worldwide unitary method did not inevitably lead to it. Given this state of affairs, said *Container,* it would be perverse constitutionally to

require one method of taxation over another when both could result in a double tax. (463 U.S. at pp. 189-193 [77 L.Ed.2d at pp. 568-571].)

*Container* refined *Japan Line*'s second additional foreign commerce clause consideration—the "one voice" standard—by stating: "In conducting this inquiry, . . . we must keep in mind that if a state tax merely has foreign resonances, but does not implicate foreign affairs, we cannot infer, '[a]bsent some explicit directive from Congress, . . . that treatment of foreign income at the federal level mandates identical treatment by the States.' [Citations.] Thus, a state tax at variance with federal policy will violate the 'one voice' standard if it *either* implicates foreign policy issues which must be left to the Federal Government *or* violates a clear federal directive. The second of these considerations is, of course, essentially a species of pre-emption analysis." (463 U.S. at p. 194 [77 L.Ed.2d at pp. 571-572], italics in original.)

According to *Container*, the most obvious foreign policy implication of a state tax is the threat it might pose of offending foreign trading partners, leading them to retaliate against the whole nation. The court in *Container* noted that the judiciary has little competence in making this determination and emphasized that the nuances of foreign policy "are much more the province of the Executive Branch and Congress than of this Court." (463 U.S. at pp. 194, 196 [77 L.Ed.2d at pp. 571-573].) The best a court can do, said *Container*, is try to develop objective standards reflecting general observations about international trade and relations. (*Id.* at p. 194 [77 L.Ed.2d at pp. 571-572].)

Doing just that, the court in *Container* set forth three reasons that weighed strongly against the possibility of justifiable and significant foreign retaliation. First, California's worldwide unitary tax method as applied to domestic-parent groups did not create an *"automatic* 'asymmetry' " in international taxation disadvantageous to a foreign entity. (463 U.S. at pp. 194-195 [77 L.Ed.2d at pp. 571-572], italics in original.) Second, the tax method was applied to a domestic corporation rather than to a foreign entity. Finally, stated *Container*, even if foreign nations have a legitimate interest in reducing the tax burden of domestic corporations, that burden results more from tax rate than allocation method, and California can simply raise its tax rate to achieve the same foreign economic effect. (*Ibid.*)

Of course, noted *Container*, the threat of retaliation is not the only foreign policy implication a state tax may have. However, the court also noted there was no amicus curiae brief from the executive branch opposing the tax at issue and setting forth other foreign policy implications. Although not conclusive on the issue, the lack of such a brief did suggest American

foreign policy was not seriously threatened by California's worldwide unitary method as applied to domestic-parent groups with foreign subsidiaries. (463 U.S. at pp. 195-196 [77 L.Ed.2d at pp. 572-573].)

The court in *Container* then turned to specific indications of congressional intent in discussing the "clear federal directive" principle and found little there.

No federal statute provided the preemptive force. Although the federal government was bound by numerous tax treaties to use some form of separate accounting in taxing the domestic income of multinational enterprises, that requirement was generally waived regarding the taxes imposed by each of the contracting nations on its own domestic corporations. If nothing else, said the *Container* court, this fact "confirms our view that such taxation is in reality of local rather than international concern." (*Container, supra,* 463 U.S. at p. 196 [77 L.Ed.2d at p. 573].) The tax treaties, moreover, did not generally cover state taxes; none of them prohibited states from using nonseparate accounting methods of taxation. The United States Senate had on one occasion declined to give its two-thirds consent to a treaty provision that would have prohibited the states from using such methods. Finally, the court in *Container* noted that Congress had long debated but had not enacted legislation regulating state taxation of income. On this record, the court could not conclude that California's worldwide unitary method as applied to domestic-parent groups with foreign subsidiaries was preempted by federal law or fatally inconsistent with federal policy. (463 U.S. at pp. 196-197 [77 L.Ed.2d at pp. 573-574].)

The last of the three United States Supreme Court decisions critical to our dormant foreign commerce clause analysis is *Wardair Canada* v. *Florida Dept. of Revenue, supra,* 477 U.S. 1. The court in *Wardair,* however, did not have occasion to apply the dormant foreign commerce clause test created in *Japan Line* and refined in *Container.* This was because the *Wardair* court found it "abundantly clear" that the federal government had affirmatively acted to permit the state tax at issue there. That tax was levied by Florida and applied to all airline aviation fuel sold within the state regardless of the airliner's destination or the amount of intrastate business the airliner did. (*Id.* at pp. 9, 12 [91 L.Ed.2d at pp. 10, 12].)

The foreign airliner and the United States as amicus curiae in *Wardair* argued there was a federal policy prohibiting Florida's unlimited tax. The policy was allegedly manifested by (1) the 1944 Chicago Convention on International Civil Aviation (1944 Convention), which the United States had signed; (2) a 1966 Resolution of the International Civil Aviation Organization (1966 Resolution), an organization to which the United States belonged;

and (3) more than 70 bilateral aviation agreements, including the 1974 United States-Canadian Aviation Agreement (Agreement). (Wardair was a Canadian airline.) The *Wardair* court viewed this evidence in a completely different light—in fact, as manifesting a federal policy *permitting* Florida's tax. Accordingly, the dormant foreign commerce clause test of *Japan Line* and *Container* did not come into play—the federal government had made its position clear in permitting such state action. (477 U.S. at pp. 8-12 [91 L.Ed.2d at pp. 9-12].)

The court's analysis was as follows. The 1944 Convention prohibited only state taxation of aviation fuel " 'on board an aircraft . . . on arrival . . . and retained on board on leaving.' " (*Wardair, supra,* 477 U.S. at p. 10 [91 L.Ed.2d at p. 11].) Consequently, according to the court, the international community had considered the issue of state taxation of aviation fuel and had decided to limit only certain state taxes while implicitly preserving the right of states to tax in nonprohibited ways. Although the 1966 Resolution indisputably sought to exempt airline fuel tax from all foreign national and subnational customs and duties, neither the executive branch nor Congress had acted in any way to make the 1966 Resolution legally binding. Furthermore, after the 1944 Convention came into force, the United States entered into more than 70 bilateral aviation agreements; not one of these agreements prohibited states from imposing a Florida-like tax. The Agreement was limited to " 'national duties and charges.' " This limitation was particularly significant, reasoned the *Wardair* court, because the Agreement was entered into eight years after the 1966 Resolution—which addressed the concern of foreign subnational taxation—and because both parties to the Agreement were federalist nations. Finally, during the Agreement, other American states and some Canadian provinces had imposed Florida-like fuel taxes without challenge; this evidenced a course of conduct by the Agreement parties that such taxation was permissible. (*Id.* at pp. 10-12 [91 L.Ed.2d at pp. 11-12].)

According to the court in *Wardair*, "all of this makes abundantly clear" that the federal government has affirmatively acted to permit the states to impose these sales taxes on aviation fuel. (477 U.S. at p. 12 [91 L.Ed.2d at p. 12].) Consequently, the foreign commerce clause test of *Japan Line* and *Container* was inapplicable. (*Ibid.*)

With this background in mind, we turn to the foreign commerce clause issue presented here.

DISCUSSION

1. *Does Wardair Apply Here to Preclude a Dormant Foreign Commerce Clause Analysis?*

■ The first issue we must consider is whether the Board is correct that this case is akin to *Wardair* and that there is an affirmative federal policy permitting California to apply the worldwide unitary tax method to domestic-parent groups with foreign subsidiaries. If the Board is correct, such affirmative action by the federal government will end our constitutional analysis because there will be no need to apply the dormant foreign commerce clause framework of *Japan Line* and *Container*. As we explain, the Board is correct in light of the interpretation of *Wardair* set forth in *Barclays*.

The Board finds such an affirmative federal policy in the following five matters: (1) The United States income tax treaties with foreign countries bind the federal government to use some form of separate accounting but do not similarly bind the states; (2) the executive branch has adopted a Model Income Tax Treaty that does not apply to state taxation and has reserved its position on the Organization of Economic Cooperation and Development (OECD) Model Convention's application to subnational taxes; (3) the United States Friendship, Commerce, and Navigation (FCN) treaties with foreign countries do not contain any state taxation restrictions; (4) Congress has not enacted any legislation prohibiting or restricting state use of the worldwide unitary method; and (5) the United States Senate refused to give its two-thirds consent to article 9(4) in the United States-United Kingdom Tax Treaty, which would have prohibited states from applying the worldwide unitary method to United Kingdom-parent unitary corporate groups.

These same factors were presented to the court in *Barclays*. The court concluded they were sufficient to invoke the *Wardair* principle, thereby obviating the need to apply a dormant foreign commerce clause analysis.

As the *Barclays* court saw it, *Wardair* "reflects a diminution in the reach of dormant foreign commerce clause analysis in favor of an expanded recognition that, under circumscribed conditions, governmental silence may constitute a ratification of state taxation of foreign commerce, rendering a dormant analysis inapposite." (2 Cal.4th at p. 714.) As *Barclays* explains, "[i]n some cases where Congress affirmatively declines to adopt certain measures, the resulting governmental 'silence' is not the sort that triggers use of a dormant foreign commerce clause analysis." (*Id.* at p. 728.)

In concluding that the factors cited by the Board here were sufficient under *Wardair* to preclude a dormant foreign commerce clause analysis, the

*Barclays* court noted that the "Senate's action with respect to article 9(4) is only the most explicit example of a persistent congressional refusal to enact curbs on the states' use of worldwide formula apportionment reaching back well before 1977, the tax year at issue in this case"; that "Congress, after being repeatedly pushed and pulled in both directions, at least for the present has decided *not* to prohibit state use of formula apportionment in cases of this kind"; and that "an extensive pattern of executive branch-negotiated diplomatic texts parallels, in our view, Congress's own unwillingness to disallow legislatively the states' application of formula apportionment methods to foreign-controlled multinational taxpayers, and bespeaks a coordinate 'acquiescence.' " (2 Cal.4th at pp. 733, 736, 738-739, italics in original.)

The *Barclays* court then rendered the following conclusion: "It is clear that federal limitations on the states' use of worldwide formula apportionment is a controversial political and economic issue of which Congress has long been aware. In light of that history, we cannot turn away from the substantial evidence of Congress's repeated refusal to intervene in the regulation of state division of income methods for tax purposes, even one that provokes continuing international complaint. Under the compulsions of established constitutional doctrine, the courts sometimes are required to divine what foreign commerce policy Congress would pursue in the absence of any indication that it has thought about the subject; it is a quite different matter, however, for a court to ignore a pattern of congressional action that evidences both an awareness of an issue and a refusal to adopt the remedy urged upon it by executive officials and resisted by its state constituencies. The latter, we believe, viewed in context alongside additional treaty materials, is a governmental silence that is eloquent. . . . [¶] We adhere to the central meaning of the high court's opinion in *Wardair* in holding that Congress's refusal to legislate restrictions on state use of worldwide formula apportionment is not the sort of governmental silence that triggers a dormant foreign commerce clause analysis." (2 Cal.4th at pp. 741-742.)

Of course, *Barclays* involved the question of whether California's worldwide unitary method of taxation as applied to *foreign*-parent groups was unconstitutional under the foreign commerce clause. Here we deal with the same question as applied to *domestic*-parent groups. Nevertheless, for purposes of whether *Wardair* applies in light of the factors cited by the Board, there is no distinction between this case and *Barclays*. For that reason, we are obligated to adopt the analysis in *Barclays* regarding *Wardair*'s applicability. (*Auto Equity Sales, Inc.* v. *Superior Court* (1962) 57 Cal.2d 450, 455-456 [20 Cal.Rptr. 321, 369 P.2d 937].)

Accordingly, the dormant foreign commerce clause analysis set forth in *Japan Line* and *Container* does not apply here. Congress has acted. "When

Congress has struck the balance it deems appropriate, the courts are no longer needed to prevent States from burdening commerce . . . . Courts are final arbiters under the Commerce Clause only when Congress has not acted." (*Merrion* v. *Jicarilla Apache Tribe, supra,* 455 U.S. at pp. 154-155 [71 L.Ed.2d at p. 40]; see *Barclays, supra,* 2 Cal.4th at pp. 722, 725, fn. 9.) California's worldwide unitary method of taxation, as applied to domestic-parent groups with foreign subsidiaries, does not violate the foreign commerce clause of the United States Constitution.

*2. Did California Unlawfully "Distort" the Amount of Colgate's Income Apportioned to California?*

Although Colgate did not file a cross-appeal, it argues the trial court erroneously determined that California's application of the worldwide unitary tax method to Colgate did not unlawfully "distort" the amount of Colgate's income apportioned to California. We denied the Board's motion to strike this argument from Colgate's respondent's brief. Accordingly, we consider the issue.

■ Colgate's argument is premised on what *Container* described as the "external consistency" requirement of fairness in an apportionment formula. Under that requirement, the application of a tax apportionment formula, such as California's worldwide unitary tax method, must be fair to pass constitutional scrutiny under both the due process and the commerce clauses; stated another way, the formula must actually reflect a reasonable sense of how income is generated. (*Container, supra,* 463 U.S. at pp. 169-170 [77 L.Ed.2d at pp. 555-556]; *Trinova Corp.* v. *Michigan Dept. of Treasury* (1991) 498 U.S. 358 [112 L.Ed.2d 884, 111 S.Ct. 818].) Under this constitutional edict, an apportionment formula will be invalidated if the taxpayer can prove by clear and cogent evidence that the income attributed to the state is " 'out of all appropriate proportion to the business transacted by the [taxpayer] in that State' " or has " 'led to a grossly distorted result.' " (*Container, supra,* 463 U.S. at pp. 170, 181 [77 L.Ed.2d at pp. 556, 563]; *Trinova, supra,* 498 U.S. at pp. 379-381 [112 L.Ed.2d at pp. 908-909].)

In addition to the constitutional "external consistency" requirement, there is a statute in California on the subject. Revenue and Taxation Code section 25137 provides: "If the allocation and apportionment provisions of this act do not fairly represent the extent of the taxpayer's business activity in this state, the taxpayer may petition for or the Franchise Tax Board may require, in respect to all or any part of the taxpayer's business activity, if reasonable: [¶] (a) Separate accounting; [¶] (b) The exclusion of any one or more of the factors; [¶] (c) The inclusion of one or more additional factors which will

fairly represent the taxpayer's business activity in this state; or [¶] (d) The employment of any other method to effectuate an equitable allocation and apportionment of the taxpayer's income."

 Colgate argues that California's worldwide unitary tax method apportioned 70 percent more income to California in comparison to separate accounting and that such apportionment contravenes both the constitutional and the statutory distortion principles. We disagree.

As noted by one commentator in reviewing *Container's* discussion of the constitutional distortion principle of "external consistency," the taxpayer's burden of proof on this issue is "steep if not insurmountable." (23 Colum. J., *supra*, at p. 457.) This is an accurate comment. In *Container*, the court noted that the three-factor formula used by California has not only "met our approval" but has become "something of a benchmark against which other apportionment formulas are judged." (463 U.S. at p. 170 [77 L.Ed.2d at p. 556].)

*Container* also noted the distortion figures in that case were based essentially on separate accounting methods that failed to account for the flow of value between the parts of the unitary business. (463 U.S. at pp. 181-184 [77 L.Ed.2d at pp. 563-565].) The same can be said here.

Colgate argues the distortion arises here because Colgate's foreign subsidiaries are substantially more profitable than its California operations. That is, the foreign subsidiaries' lower property, payroll, and sales figures for the same level of productivity result in a distorted apportionment to California under the three-factor formula. In *Container*, the taxpayer made the same argument. The court in *Container* rejected this argument, stating: "The problem with this argument is obvious: the profit figures relied on by [the taxpayer] are based on precisely the sort of formal geographical accounting whose basic theoretical weaknesses justify resort to formula apportionment in the first place." (463 U.S. at p. 181 [77 L.Ed.2d at p. 563].)

Apparently, there is only one United States Supreme Court decision that has invalidated a state tax apportionment formula applied to a corporate income tax or a franchise tax of a manufacturing or mercantile company like Colgate. (23 Colum. J., *supra*, at pp. 450-451; see also *Container, supra*, 463 U.S. at pp. 182-184 [77 L.Ed.2d at pp. 564-565].) That decision is from 1931 and is entitled *Hans Rees' Sons Inc.* v. *North Carolina* ex rel. *Maxwell* (1931) 283 U.S. 123 [75 L.Ed. 879, 51 S.Ct. 385]. In that case, a one-factor unitary tax method was applied to a domestic company. Although the company's income in *Hans Rees* was derived from a variety of far-flung activities—

including buying, selling and manufacturing—North Carolina's statutory formula allocated the entire wholesale profit to North Carolina, where the manufacturing occurred. This allocation resulted in 250 percent more income attributed to the state. (283 U.S. at pp. 126-128 [75 L.Ed.2d at pp. 889-898]; see 23 Colum. J., *supra*, at p. 450; *Container, supra*, 463 U.S. at pp. 183-184 [77 L.Ed.2d at pp. 564-565].)

Colgate's 70 percent figure—which does not account for the flow of value between the parts of Colgate's unitary business—is not comparable to the 250 percent tally in *Hans Rees.* Colgate has not met the steep burden imposed by the constitutional distortion principle of "external consistency."[7]

Colgate realizes this and pins its hopes on Revenue and Taxation Code section 25137. Colgate faces an uphill battle here as well. ■ Under section 25137 and California case law, the Board is given discretion to select the factors to be used in a tax formula. (*McDonnell Douglas Corp.* v. *Franchise Tax Bd.* (1968) 69 Cal.2d 506, 512 [72 Cal.Rptr. 465, 446 P.2d 313].) Where a taxpayer petitions for an alternative formula under section 25137, the taxpayer bears the burden of establishing by clear and convincing evidence that the formula used by the Board reaches an unreasonable result in his or her case. (69 Cal.2d at p. 512; Rev. & Tax. Code, § 25137; *Communications Satellite Corp.* v. *Franchise Tax Bd.* (1984) 156 Cal.App.3d 726, 746-749 [203 Cal.Rptr. 779]; see e.g., *Firestone Tire & Rubber Co.* v. *County of Monterey* (1990) 223 Cal.App.3d 382, 387-388 [272 Cal.Rptr. 745].)

■ Colgate argues that the trial court used the constitutional "out of all proportion" test to dismiss Colgate's statutory assertion under Revenue and Taxation Code section 25137. Additionally, Colgate argues that testimony from the Board's counsel for multistate tax affairs establishes that the Board unlawfully fails to consider separate accounting as an alternative for unitary companies under section 25137. The first of these arguments is meritless, rendering a discussion of the second unnecessary.

As noted by the Board, the trial court did not apply the constitutional "out of all proportion" test to the statutory issue. In reviewing the Board's denial of Colgate's Revenue and Taxation Code section 25137 petition, the trial court cited *Container*'s "flow of value" concept and upheld the Board's determination that Colgate had not demonstrated by clear and convincing evidence that California's apportionment formula unfairly represented the extent of Colgate's business activity in California. (*Container, supra*, 463

---

[7]In a recent decision, the United States Supreme Court relied on *Container*'s flow of value concept to uphold the application of the three-factor formula involved here to a value added tax on a unitary business. (*Trinova, supra*, 498 U.S. 358 [112 L.Ed.2d 884].)

U.S. at pp. 181-184 [77 L.Ed.2d at pp. 563-565].) This constituted a correct application of the statutory standard set forth in section 25137. (*McDonnell Douglas Corp.* v. *Franchise Tax Bd., supra,* 69 Cal.2d at p. 512; see *Amoco Production Company* v. *Armold* (1974) 213 Kan. 636 [518 P.2d 453, 463-465].)

Citing *Hunt-Wesson Foods, Inc.* v. *County of Alameda* (1974) 41 Cal.App.3d 163, 176 [116 Cal.Rptr. 160], Colgate contends the right to recover taxes paid under protest is a fundamental vested right; therefore, the trial court was obligated to exercise its independent judgment on the Revenue and Taxation Code section 25137 evidence. We disagree with Colgate for two reasons. First, the *Hunt-Wesson* court did not hold that the right to recover taxes paid under protest is a fundamental vested right. That court said the argument could be made. (41 Cal.App.3d at p. 176.) Second, and more importantly, the precise issue involved here concerns the application of a particular tax method that is within the discretion of the Board under statutory directive. (*McDonnell Douglas Corp.* v. *Franchise Tax Bd., supra,* 69 Cal.2d at p. 512; Rev. & Tax. Code, §§ 25120-25139; Cal. Code Regs., tit. 18, § 25137-6; see *Amoco Production Company* v. *Arnold, supra,* 518 P.2d at pp. 463-465; see e.g., *Firestone Tire & Rubber Co.* v. *County of Monterey, supra,* 223 Cal.App.3d at pp. 387-388.) Colgate can hardly ascribe an individually "vested" status to this process. (See *Hunt-Wesson, supra,* 41 Cal.App.3d at p. 174.) As noted, *McDonnell Douglas* is the relevant decision on this limited issue. (69 Cal.2d at p. 512.)

Our resolution of the statutory distortion issue renders irrelevant Colgate's argument that the Board unlawfully fails to consider separate accounting as an alternative for unitary companies under Revenue and Taxation Code section 25137. Colgate has not shown that California's apportionment formula unfairly represented the extent of Colgate's business activity in California. The alternatives set forth in section 25137 are invoked only if the taxpayer makes that showing. Consequently, we do not address this argument.

3. *The Sanctions and Costs Issues*

■ The Board claims the trial court abused its discretion in denying the Board's motion for sanctions against Colgate. In that motion, the Board argued that Colgate unduly delayed in producing certain documents evidencing the unitary nature of Colgate's operations.

This matter arose when Colgate, during the first two days of trial, belatedly produced to the Board's counsel five boxes of documents pursuant to the Board's requests for production of documents and a court order based on those requests. Included in this belated production were documents relevant

to the operation of Colgate's Danish subsidiary and therefore relevant to the issue of whether Colgate's subsidiaries operated in a unitary fashion with the domestic parent corporation. This production occurred in mid-July 1988. It was not until mid-February 1989, however, that the Board moved for sanctions on this matter; this was after the trial was over and after the Board had won on the unitary issue. On these facts, the trial court declined to award sanctions because the motion was untimely and failed to evidence prejudice against the Board.

The trial court has broad discretion in imposing discovery sanctions, subject to reversal only for arbitrary, capricious or whimsical action. (See *Sauer* v. *Superior Court* (1987) 195 Cal.App.3d 213, 228 [240 Cal.Rptr. 489]; *Kahn* v. *Kahn* (1977) 68 Cal.App.3d 372, 380-381 [137 Cal.Rptr. 332] [although these cases were not decided under the current discovery statutes, the general principle of review they enunciate remains valid. (See Code Civ. Proc., former § 2034.)]) Code of Civil Procedure section 2023, subdivision (b)(1), upon which the Board relies, does not alter this well-settled principle and the Board concedes as much. That section and subdivision provides in pertinent part that "[i]f a monetary sanction is authorized by any provision of this article, the court shall impose that sanction unless it finds that the one subject to the sanction acted with substantial justification or that other circumstances make the imposition of the sanction unjust."

The Board argues that the trial court's finding of no prejudice conveys the message that it is acceptable to abuse discovery and conceal evidence, so long as the party seeking discovery cannot prove how those actions prejudiced its case. Of course, prejudice is difficult to prove in the face of victory. The Board's real concern is that such discovery abuse will go unpunished. The Board can rest assured that the trial court possesses an array of weapons to counter parties abusing the discovery process. These weapons include a "Monetary sanction," an "Issue sanction," an "Evidence sanction," a "Terminating Sanction," and a "Contempt Sanction." (Code Civ. Proc., § 2023, subd. (b)(1)(2)(3)(4)(5).) The problem for the Board here is that a timely motion for sanctions is required to make these sanctions effective. The Board made its motion after the trial was over and after it had won on the issue for which it sought sanctions. And the Board cannot claim it did not know about the discovery abuse until it made its motion in February 1989. The Board admits it uncovered the abuse in July 1988 during the first days of trial.

The Board argues it was prejudiced because it could have moved for summary judgment on the unitary issue had the documents been timely produced, and the trial could have been shortened if not eliminated. We

doubt seriously that operational documents concerning one of Colgate's seventy-five foreign subsidiaries were the only evidence standing in the way of a summary judgment motion on the unitary issue. In any event, the nature of the unitary issue is essentially factual and particular to the corporate enterprise being examined. For that reason, the issue would not usually be amenable to summary adjudication resolution.[8] We also doubt that Colgate's timely production could have eliminated or significantly shortened the trial. The testimony part of the trial also encompassed the distortion issues, and the heart of the lawsuit concerned the foreign commerce clause issue.

The trial court did not abuse its discretion in denying the Board's motion for discovery sanctions.

Our partial reversal of the judgment resolves the issue of costs awarded below to Colgate. Under our decision, Colgate is no longer the prevailing party and is therefore not entitled to costs.

### DISPOSITION

The portion of the judgment regarding the foreign commerce clause issue is reversed. The portion of the judgment regarding the constitutional and statutory distortion issues and on the matter of sanctions is affirmed. The Board is awarded its costs on appeal.

Puglia, P. J., and Sparks, J., concurred.

Respondent's petition for review by the Supreme Court was denied February 18, 1993.

---

[8]We note that, with certain exceptions, Code of Civil Procedure section 437c was amended in 1990 to eliminate motions for summary adjudication of *issue(s)*.