# BARCLAYS BANK PLC *v.* FRANCHISE TAX BOARD OF CALIFORNIA

No. 92–1384.   Argued March 28, 1994—Decided June 20, 1994*

---

*Together with No. 92–1839, *Colgate-Palmolive Co.* v. *Franchise Tax Board of California,* also on certiorari to the same court.

GINSBURG, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and BLACKMUN, STEVENS, KENNEDY, and SOUTER, JJ., joined, and in all but Part IV–B of which SCALIA, J., joined. BLACKMUN, J., filed a concurring opinion, *post*, p. 331. SCALIA, J., filed an opinion concurring in part and concurring in the judgment, *post*, p. 331. O'CONNOR, J., filed an opinion concurring in the judgment in part and dissenting in part, in which THOMAS, J., joined, *post*, p. 332.

*Joanne M. Garvey* argued the cause for petitioner in No. 92–1384. With her on the briefs were *Joan K. Irion, Miles N. Ruthberg,* and *Teresa A. Maloney. James P. Kleier* argued the cause for petitioner in No. 92–1839. With him on the briefs were *Walter Hellerstein, Prentiss Willson, Jr., Clare M. Rathbone,* and *Franklin C. Latcham.*

*Timothy G. Laddish,* Assistant Attorney General of California, argued the cause for respondent in both cases. With him on the brief for respondent in No. 92–1384 were *Daniel E. Lungren,* Attorney General of California, *Robert D. Milam,* Deputy Attorney General, and *Benjamin F. Miller.* Mr. Lungren, *Lawrence K. Keethe,* Supervising Deputy Attorney General of California, *John D. Schell,* Deputy Attorney General, and *Claudia K. Land* filed a brief for respondent in No. 92–1839.

*Solicitor General Days* argued the cause for the United States as *amicus curiae* urging affirmance in both cases. With him on the brief were *Assistant Attorney General Argrett* and *Deputy Solicitor General Wallace.*†

---

†*Kendall L. Houghton* and *William D. Peltz* filed a brief for the Committee on State Taxation as *amicus curiae* urging reversal in both cases.

Briefs of *amici curiae* urging reversal in No. 92–1384 were filed for the Government of the United Kingdom by *Jerome B. Libin* and *William H. Morris;* for the Member States of the European Communities et al. by Messrs. Libin and Morris; for Banque Nationale de Paris by *Roy E. Crawford* and *Russell D. Uzes;* for the Confederation of British Industry by *Lee H. Spence;* for the Council of Netherlands Industrial Federations by

JUSTICE GINSBURG delivered the opinion of the Court.

Eleven years ago, in *Container Corp. of America* v. *Franchise Tax Bd.*, 463 U. S. 159 (1983), this Court upheld California's income-based corporate franchise tax, as applied to a

---

*F. Eugene Wirwahn;* for the Federation of German Industries et al. by Mr. Wirwahn; for Keidanren (Japan Federation of Economic Organizations) by *C. David Swenson, Dennis I. Meyer, Leonard B. Terr,* and *Harry A. Franks, Jr.;* for the Japan Tax Association by *John A. Sturgeon;* for the Organization for International Investment Inc. et al. by *James Merle Carter;* for Reuters Ltd. by *Steven Alan Reiss* and *Philip T. Kaplan;* and for the Washington Legal Foundation by *Daniel J. Popeo* and *Richard A. Samp.*

Briefs of *amici curiae* urging reversal in No. 92–1839 were filed for the Chamber of Commerce of the United States by *Timothy B. Dyk, Beth Heifetz, Robin S. Conrad, Mona C. Zeiberg,* and *Jan S. Amundson;* and for the National Foreign Trade Council, Inc., et al. by *Philip D. Morrison* and *Mary C. Bennett.*

Briefs of *amici curiae* urging affirmance in both cases were filed for the State of Alaska et al. by *Bruce M. Botelho,* Attorney General of Alaska, and *Lauri J. Adams,* Assistant Attorney General, and by the Attorneys General for their respective States as follows: *Joseph P. Mazurek* of Montana, *Jeffrey R. Howard* of New Hampshire, and *Theodore R. Kulongoski* of Oregon; for the State of New Mexico et al. by *Tom Udall,* Attorney General of New Mexico, *Daniel Yohalen,* Assistant Attorney General, and *Bruce J. Fort* and *Frank D. Katz,* Special Assistant Attorneys General, and by the Attorneys General for their respective States as follows: *Winston Bryant* of Arkansas, *Gale A. Norton* of Colorado, *Larry EchoHawk* of Idaho, *Michael E. Carpenter* of Maine, and *Jeffrey B. Pine* of Rhode Island; for the State of North Dakota et al. by *M. K. Heidi Heitkamp,* Attorney General of North Dakota, and *Donnita A. Wald,* Assistant Attorney General, *Robert A. Marks,* Attorney General of Hawaii, and *Kevin T. Wakayama,* Supervising Deputy Attorney General, and *Robert T. Stephan,* Attorney General of Kansas; for the California Legislature by *Bion M. Gregory, James A. Marsala, Baldev S. Heir,* and *Michael R. Kelly;* for the California Tax Reform Association et al. by *Jack A. Blum* and *Martin Lobel;* for Citizens for Tax Justice by *Jonathan P. Hiatt;* for the Council of State Governments et al. by *Richard Ruda* and *Lee Fennell;* for the Multistate Tax Commission by *Alan H. Friedman* and *Paull Mines;* for Senator Dorgan et al. by *Charles Rothwell Nesson;* and for Congressman Edwards et al. by *Martin Lobel, Jack A. Blum,* and *Dina R. Lassow.*

*Eric J. Miethke, John E. Mueller,* and *Sheridan M. Cranmer* filed a brief for Litton Industries, Inc., et al. as *amici curiae* urging affirmance in No. 92–1839.

multinational enterprise, against a comprehensive challenge made under the Due Process and Commerce Clauses of the Federal Constitution. *Container Corp.* involved a corporate taxpayer domiciled and headquartered in the United States; in addition to its stateside components, the taxpayer had a number of overseas subsidiaries incorporated in the countries in which they operated. The Court's decision in *Container Corp.* did not address the constitutionality of California's taxing scheme as applied to "domestic corporations with foreign parents or [to] foreign corporations with either foreign parents or foreign subsidiaries." *Id.,* at 189, n. 26. In the consolidated cases before us, we return to the taxing scheme earlier considered in *Container Corp.* and resolve matters left open in that case.

The petitioner in No. 92–1384, Barclays Bank PLC (Barclays), is a United Kingdom corporation in the Barclays Group, a multinational banking enterprise. The petitioner in No. 92–1839, Colgate-Palmolive Co. (Colgate), is the United States-based parent of a multinational manufacturing and sales enterprise. Each enterprise has operations in California. During the years here at issue, California determined the state corporate franchise tax due for these operations under a method known as "worldwide combined reporting." California's scheme first looked to the worldwide income of the multinational enterprise, and then attributed a portion of that income (equal to the average of the proportions of worldwide payroll, property, and sales located in California) to the California operations. The State imposed its tax on the income thus attributed to Barclays' and Colgate's California business.

Barclays urges that California's tax system distinctively burdens foreign-based multinationals and results in double international taxation, in violation of the Commerce and Due Process Clauses. Both Barclays and Colgate contend that the scheme offends the Commerce Clause by frustrating the Federal Government's ability to "speak with one voice when

regulating commercial relations with foreign governments."
*Japan Line, Ltd.* v. *County of Los Angeles*, 441 U. S. 434, 449
(1979) (internal quotation marks omitted). We reject these
arguments, and hold that the Constitution does not impede
application of California's corporate franchise tax to Barclays
and Colgate. Accordingly, we affirm the judgments of the
California Court of Appeal.

I

A

The Due Process and Commerce Clauses of the Constitu-
tion, this Court has held, prevent States that impose an
income-based tax on nonresidents from "tax[ing] value
earned outside [the taxing State's] borders." *ASARCO Inc.*
v. *Idaho Tax Comm'n*, 458 U. S. 307, 315 (1982). But when
a business enterprise operates in more than one taxing juris-
diction, arriving at "precise territorial allocations of 'value'
is often an elusive goal, both in theory and in practice." *Con-
tainer Corp.*, 463 U. S., at 164. Every method of allocation
devised involves some degree of arbitrariness. See *id.*, at
182.

One means of deriving locally taxable income, generally
used by States that collect corporate income-based taxes, is
the "unitary business" method. As explained in *Container
Corp.*, unitary taxation "rejects geographical or transac-
tional accounting," which is "subject to manipulation" and
does not fully capture "the many subtle and largely unquan-
tifiable transfers of value that take place among the compo-
nents of a single enterprise." *Id.*, at 164–165. The "unitary
business/formula apportionment" method

"calculates the local tax base by first defining the scope
of the 'unitary business' of which the taxed enterprise's
activities in the taxing jurisdiction form one part, and
then apportioning the total income of that 'unitary busi-
ness' between the taxing jurisdiction and the rest of the
world on the basis of a formula taking into account ob-

jective measures of the corporation's activities within and without the jurisdiction." *Id.*, at 165.[1]

During the income years at issue in these cases—1977 for Barclays, 1970–1973 for Colgate—California assessed its corporate franchise tax by employing a "worldwide combined reporting" method. California's scheme required the taxpayer to aggregate the income of all corporate entities composing the unitary business enterprise, including in the aggregation both affiliates operating abroad and those operating within the United States. Having defined the scope of the "unitary business" thus broadly, California used a long-accepted method of apportionment, commonly called the "three-factor" formula, to arrive at the amount of income attributable to the operations of the enterprise in California. Under the three-factor formula, California taxed a percentage of worldwide income equal to the arithmetic average of the proportions of worldwide payroll, property, and sales located inside the State. Cal. Rev. & Tax. Code Ann. § 25128

---

[1] This Court first considered the "unitary business principle" in 1897, *Adams Express Co.* v. *Ohio State Auditor*, 165 U. S. 194, 220–221; we revisited this "settled jurisprudence" most recently in *Allied-Signal, Inc.* v. *Director, Div. of Taxation*, 504 U. S. 768, 779–788 (1992). See generally 1 J. Hellerstein & W. Hellerstein, State Taxation: Corporate Income and Franchise Taxes ¶ 8.03, p. 8–29 (2d ed. 1993); *id.*, ¶ 8.05. On the determination whether a business is "unitary," see *Allied-Signal*, 504 U. S., at 781–782 (business may be treated as unitary, compatibly with constitutional limitations, if it exhibits functional integration, centralization of management, and economies of scale); *Edison California Stores, Inc.* v. *McColgan*, 30 Cal. 2d 472, 481, 183 P. 2d 16, 21 (1947) ("If the operation of the portion of the business done within the state is dependent upon or contributes to the operation of the business without the state, the operations are unitary."); *Butler Brothers* v. *McColgan*, 17 Cal. 2d 664, 678, 111 P. 2d 334, 341 (1941) (A business is unitary if there is "(1) [u]nity of ownership; (2) [u]nity of operation as evidenced by central purchasing, advertising, accounting and management divisions; and (3) unity of use of its centralized executive force and general system of operation."), aff'd, 315 U. S. 501 (1942).

(West 1992). Thus, if a unitary business had 8% of its payroll, 3% of its property, and 4% of its sales in California, the State took the average—5%—and imposed its tax on that percentage of the business' total income.[2]

## B

The corporate income tax imposed by the United States employs a "separate accounting" method, a means of apportioning income among taxing sovereigns used by all major developed nations. In contrast to combined reporting, separate accounting treats each corporate entity discretely for the purpose of determining income tax liability.[3]

Separate accounting poses the risk that a conglomerate will manipulate transfers of value among its components to minimize its total tax liability. To guard against such manipulation, transactions between affiliated corporations must be scrutinized to ensure that they are reported on an "arm's-length" basis, i. e., at a price reflecting their true market value. See 26 U. S. C. §482; Treas. Reg. §1.482–1T(b), 26 CFR §1.482–1T(b) (1993).[4] Assuming that all transactions are assigned their arm's-length values in the corporate accounts, a jurisdiction using separate accounting taxes corporations that operate within its borders only on the income

---

[2] In 1993, California modified the formula to double the weight of the sales factor. Cal. Rev. & Tax. Code Ann. §25128 (West Supp. 1994); 1993 Cal. Stats., ch. 946, §1.

[3] An affiliated group of domestic corporations may, however, elect to file a consolidated federal tax return in lieu of separate returns. 26 U. S. C. §1501.

[4] Effective enforcement of arm's-length standards requires exacting scrutiny by the taxing jurisdiction, and some commentators maintain that the results are arbitrary in any event. See 1 Hellerstein & Hellerstein, *supra*, ¶8.03 (describing "three inherent defects" of separate accounting: compliance expense, impracticability, and the difficulty of arriving at "arm's-length" prices).

those corporations recognize on their own books. See *Container Corp.*, 463 U. S., at 185.[5]

At one time, a number of States used worldwide combined reporting, as California did during the years at issue. In recent years, such States, including California, have modified their systems at least to allow corporate election of some variant of an approach that confines combined reporting to the United States' "water's edge." See 1 Hellerstein & Hellerstein, *supra* n. 1, ¶ 8.16, at 8–185 to 8–187. California's 1986 modification of its corporate franchise tax, effective in 1988, 1986 Cal. Stats., ch. 660, § 6, made it nearly the last State to give way. 1 Hellerstein & Hellerstein, *supra* n. 1, ¶ 8.16, at 8–187.

California corporate taxpayers, under the State's water's edge alternative, may elect to limit their combined reporting group to corporations in the unitary business whose individual presence in the United States surpasses a certain threshold. Cal. Rev. & Tax. Code Ann. § 25110 (West 1992); see Leegstra, Eager, & Stolte, The California Water's-Edge Election, 6 J. St. Tax'n 195 (1987) (explaining operation of California's water's edge system). The 1986 amendment conditioned a corporate group's water's edge election on payment of a substantial fee, and allowed the California Franchise Tax Board (Tax Board) to disregard a water's edge election under certain circumstances. In 1993, California again modified its corporate franchise tax statute, this time to allow domestic and foreign enterprises to elect water's edge treatment without payment of a fee and without the threat of disregard. 1993 Cal. Stats., ch. 31, § 53; *id.*, ch. 881,

---

[5] Under the Internal Revenue Code, a foreign corporation reports only income derived from a United States source or otherwise effectively connected with the corporation's conduct of a United States trade or business. 26 U. S. C. §§ 881, 882, 884, 864(c). Domestic corporations must report all income, whether the source is domestic or foreign, § 11, though they receive a tax credit for qualifying taxes paid to foreign sovereigns, 26 U. S. C. §§ 901–908 (1988 ed. and Supp. IV).

§ 22. See Cal. Rev. & Tax. Code Ann. § 25110 (West Supp. 1994). The new amendments became effective in January 1994.

### C

The first of these consolidated cases, No. 92–1384, is a tax refund suit brought by two members of the Barclays Group, a multinational banking enterprise. Based in the United Kingdom, the Barclays Group includes more than 220 corporations doing business in some 60 nations. The two refund-seeking members of the Barclays corporate family did business in California and were therefore subject to California's franchise tax. Barclays Bank of California (Barcal), one of the two taxpayers, was a California banking corporation wholly owned by Barclays Bank International Limited (BBI), the second taxpayer. BBI, a United Kingdom corporation, did business in the United Kingdom and in more than 33 other nations and territories.

In computing its California franchise tax based on 1977 income, Barcal reported only the income from its own operations. BBI reported income on the assumption that it participated in a unitary business composed of itself and its subsidiaries, but not its parent corporation and the parent's other subsidiaries. After auditing BBI's and Barcal's 1977 income year franchise tax returns, the Tax Board, respondent here, determined that both were part of a worldwide unitary business, the Barclays Group. Ultimately, the Tax Board assessed additional tax liability of $1,678 for BBI and $152,420 for Barcal.[6]

---

[6] The figures used by the Tax Board were:

| Taxpayer | Worldwide Taxable Income | California Formula Percentage | Business Income | Franchise Tax |
|---|---|---|---|---|
| Barcal | $401,566,973 | .0139032% | $5,583,066 | $693,696 |
| BBI | 401,566,973 | .0003232% | 129,786 | 16,126 |

App. in No. 92–1384, pp. A–13 to A–14 (Joint Stipulation of Facts ¶ 22).

Barcal and BBI paid the assessments and sued for refunds. They prevailed in California's lower courts, but were unsuccessful in California's Supreme Court. The California Supreme Court held that the tax did not impair the Federal Government's ability to "speak with one voice" in regulating foreign commerce, see *Japan Line, Ltd.* v. *County of Los Angeles,* 441 U. S., at 449, and therefore did not violate the Commerce Clause. Having so concluded, the California Supreme Court remanded the case to the Court of Appeal for further development of Barclays' claim that the compliance burden on foreign-based multinationals imposed by California's tax violated both the Due Process Clause and the nondiscrimination requirement of the Commerce Clause. *Barclay's Bank Int'l, Ltd.* v. *Franchise Tax Bd.,* 2 Cal. 4th 708, 829 P. 2d 279, cert. denied, 506 U. S. 870 (1992). On remand, the Court of Appeal decided the compliance burden issues against Barclays, 10 Cal. App. 4th 1742, 14 Cal. Rptr. 2d 537 (3d Dist. 1992), and the California Supreme Court denied further review. The case is therefore before us on writ of certiorari to the California Court of Appeal. 510 U. S. 942 (1993). Barclays has conceded, for purposes of this litigation, that the entire Barclays Group formed a worldwide unitary business in 1977.[7]

The petitioner in No. 92–1839, Colgate-Palmolive Co., is a Delaware corporation headquartered in New York. Colgate and its subsidiaries doing business in the United States engaged principally in the manufacture and distribution of household and personal hygiene products. In addition, Colgate owned some 75 corporations that operated entirely outside the United States; these foreign subsidiaries also engaged primarily in the manufacture and distribution of household and personal hygiene products. When Colgate

---

[7] The petitioner in No. 92–1384, Barclays Bank PLC, is the successor in interest to the tax refund claims of both Barcal and BBI. For convenience, this opinion uses "Barclays" to refer collectively to the taxpayers and the petitioner in No. 92–1384.

filed California franchise tax returns based on 1970–1973 income, it reported the income earned from its foreign operations on a separate accounting basis. Essentially, Colgate maintained that the Constitution compelled California to limit the reach of its unitary principle to the United States' water's edge. See *supra*, at 306. The Tax Board determined that Colgate's taxes should be computed on the basis of worldwide combined reporting, and assessed a 4-year deficiency of $604,765.[8] Colgate paid the tax and sued for a refund.

Colgate prevailed in the California Superior Court, which found that the Federal Government had condemned worldwide combined reporting as impermissibly intrusive upon the Nation's ability uniformly to regulate foreign commercial relations. No. 319715 (Super. Ct. Sacramento Cty., Apr. 19, 1989) (reprinted in App. to Pet. for Cert. in No. 92–1839, pp. 88a–102a). The Court of Appeal reversed, concluding

---

[8] Colgate offered the following figures, using a water's edge approach:

| Income Year | Water's edge Taxable Income | Formula Percentage | California Business Income | Franchise Tax |
|---|---|---|---|---|
| 1970 | $25,652,055 | 9.31920% | $2,390,566 | $167,340 |
| 1971 | 27,520,141 | 9.01730% | 2,481,574 | 173,710 |
| 1972 | 32,440,358 | 9.21640% | 2,989,833 | 227,227 |
| 1973 | 36,554,060 | 8.88730% | 3,248,669 | 269,640 |

No. 319715 (Super. Ct. Sacramento Cty., Apr. 19, 1989) (reprinted in App. to Pet. for Cert. in No. 92–1839, p. 85a).

Under California's worldwide combined reporting method, the computations were:

| Income Year | Worldwide Taxable Income | Formula Percentage | California Business Income | Franchise Tax |
|---|---|---|---|---|
| 1970 | $ 91,566,729 | 4.42075% | $4,047,936 | $283,356 |
| 1971 | 108,177,612 | 4.12017% | 4,457,101 | 311,997 |
| 1972 | 123,779,352 | 4.03444% | 4,993,803 | 379,529 |
| 1973 | 151,585,860 | 3.71812% | 5,636,144 | 467,800 |

*Id.*, at 84a.

that evidence of the Federal Executive's opposition to the tax was insufficient. 4 Cal. App. 4th 1681, 1700–1712, 284 Cal. Rptr. 780, 792–800 (3d Dist. 1991). The California Supreme Court returned the case to the Court of Appeal with instructions "to vacate its decision and to refile the opinion after modification in light of" that Court's decision in *Barclays*. 9 Cal. Rptr. 2d 358, 831 P. 2d 798 (1992). In its second decision, the Court of Appeal again ruled against Colgate. 10 Cal. App. 4th 1768, 13 Cal. Rptr. 2d 761 (3d Dist. 1992). The California Supreme Court denied further review, and the case is before us on writ of certiorari to the Court of Appeal. 510 U. S. 942 (1993). Like Barclays, Colgate concedes, for purposes of this litigation, that during the years in question, its business, worldwide, was unitary.

## II

The Commerce Clause expressly gives Congress power "[t]o regulate Commerce with foreign Nations, and among the several States." U. S. Const., Art. I, §8, cl. 3. It has long been understood, as well, to provide "protection from state legislation inimical to the national commerce [even] where Congress has not acted . . . ." *Southern Pacific Co.* v. *Arizona ex rel. Sullivan*, 325 U. S. 761, 769 (1945); see also *South Carolina Highway Dept.* v. *Barnwell Brothers, Inc.*, 303 U. S. 177, 185 (1938) (Commerce Clause "by its own force prohibits discrimination against interstate commerce").[9] The Clause does not shield interstate (or foreign) commerce from its "fair share of the state tax burden." *Department of Revenue of Wash.* v. *Association of Wash. Stevedoring Cos.*, 435 U. S. 734, 750 (1978). Absent congressional approval, however, a state tax on such commerce will not survive Commerce Clause scrutiny if the taxpayer demonstrates that the tax (1) applies to an activity lacking a substantial nexus to the taxing State; (2) is not fairly appor-

---

[9] Our jurisprudence refers to the self-executing aspect of the Commerce Clause as the "dormant" or "negative" Commerce Clause.

tioned; (3) discriminates against interstate commerce; *or* (4) is not fairly related to the services provided by the State. *Complete Auto Transit, Inc.* v. *Brady,* 430 U. S. 274, 279 (1977).

In "the unique context of foreign commerce," a State's power is further constrained because of "the special need for federal uniformity." *Wardair Canada Inc.* v. *Florida Dept. of Revenue,* 477 U. S. 1, 8 (1986). "'In international relations and with respect to foreign intercourse and trade the people of the United States act through a single government with unified and adequate national power.'" *Japan Line, Ltd.* v. *County of Los Angeles,* 441 U. S., at 448, quoting *Board of Trustees of Univ. of Ill.* v. *United States,* 289 U. S. 48, 59 (1933). A tax affecting *foreign* commerce therefore raises two concerns in addition to the four delineated in *Complete Auto.* The first is prompted by "the enhanced risk of multiple taxation." *Container Corp.,* 463 U. S., at 185. The second relates to the Federal Government's capacity to "'speak with one voice when regulating commercial relations with foreign governments.'" *Japan Line,* 441 U. S., at 449, quoting *Michelin Tire Corp.* v. *Wages,* 423 U. S. 276, 285 (1976).

California's worldwide combined reporting system easily meets three of the four *Complete Auto* criteria. The nexus requirement is met by the business all three taxpayers— Barcal, BBI, and Colgate—did in California during the years in question. See *Mobil Oil Corp.* v. *Commissioner of Taxes of Vt.,* 445 U. S. 425, 436–437 (1980).[10] The "fair apportion-

---

[10] *Amicus curiae* the Government of the United Kingdom points to *Quill Corp.* v. *North Dakota,* 504 U. S. 298 (1992), which held that the Commerce Clause demands more of a connection than the "minimum contacts" that suffice to satisfy the due process nexus requirement for assertion of judicial jurisdiction. Brief for Government of United Kingdom as *Amicus Curiae* in No. 92–1384, pp. 24–25. Noting the absence of "any meaningful contact" between California and the activities of Barclays Group members operating exclusively *outside* the United States, *id.,* at 25, the United Kingdom asserts that the trial court erred if it concluded

ment" standard is also satisfied. Neither Barclays nor Colgate has demonstrated the lack of a "rational relationship between the income attributed to the State and the intrastate values of the enterprise," *Container Corp.*, 463 U. S., at 180–181 (internal quotation marks omitted); nor have the petitioners shown that the income attributed to California is "out of all appropriate proportion to the business transacted by the [taxpayers] in that State." *Id.*, at 181 (internal quotation marks omitted). We note in this regard that, "if applied by every jurisdiction," California's method "would result in no more than all of the unitary business' income being taxed." *Id.*, at 169. And surely California has afforded Colgate and the Barclays taxpayers "protection, opportunities and benefits" for which the State can exact a return. *Wisconsin* v. *J. C. Penney Co.*, 311 U. S. 435, 444 (1940); see *ASARCO Inc.* v. *Idaho State Tax Comm'n*, 458 U. S., at 315.

Barclays (but not Colgate) vigorously contends, however, that California's worldwide combined reporting scheme violates the antidiscrimination component of the *Complete Auto*

---

that "California had the requisite nexus with *every member* of the Barclays group," *id.*, at 27 (emphasis added).

The trial court, however, did not reach the conclusion the United Kingdom suggests it did, nor was there cause for it so to do. As the United Kingdom recognizes, the theory underlying unitary taxation is that "certain intangible 'flows of value' within the unitary group serve to link the various members together as if they were essentially a single entity." *Id.*, at 26. Formulary apportionment of the income of a multijurisdictional (but unitary) business enterprise, if fairly done, taxes only the "income generated within a State." *Allied-Signal, Inc.* v. *Director, Div. of Taxation*, 504 U. S., at 783 (upholding "unitary business principle" as "an appropriate means for distinguishing between income generated within a State and income generated without"). *Quill* held that the Commerce Clause requires a *taxpayer's* "physical presence" in the taxing jurisdiction before that jurisdiction can constitutionally impose a use tax. 504 U. S., at 317. The California presence of the taxpayers before us is undisputed, and we find nothing in *Quill* to suggest that California may not reference the income of corporations worldwide with whom those taxpayers are closely intertwined in order to approximate the taxpayers' California income.

test.  Barclays maintains that a foreign owner of a taxpayer filing a California tax return "is forced to convert its diverse financial and accounting records from around the world into the language, currency, and accounting principles of the United States" at "prohibitiv[e]" expense.  Brief for Petitioner in No. 92–1384, p. 44.[11]  Domestic-owned taxpayers, by contrast, need not incur such expense because they "already keep most of their records in English, in United States currency, and in accord with United States accounting principles."  *Id.*, at 45.  Barclays urges that imposing this "prohibitive administrative burden," *id.*, at 43, on foreign-owned enterprises gives a competitive advantage to their United States-owned counterparts and constitutes "economic protectionism" of the kind this Court has often condemned. *Id.*, at 43–46.

Compliance burdens, if disproportionately imposed on out-of-jurisdiction enterprises, may indeed be inconsonant with the Commerce Clause.  See, *e. g., Hunt* v. *Washington State Apple Advertising Comm'n*, 432 U. S. 333, 350–351 (1977) (increased costs imposed by North Carolina statute on out-of-state apple producers "would tend to shield the local apple industry from the competition of Washington apple growers," thereby discriminating against those growers). The factual predicate of Barclays' discrimination claim, however, is infirm.

Barclays points to provisions of California's implementing regulations setting out three discrete means for a taxpayer to fulfill its franchise tax reporting requirements.  Each of these modes of compliance would require Barclays to gather and present much information not maintained by the unitary

---

[11] Barclays estimates, and the trial court found, that an accounting system capable of conveying the information Barclays thought California's worldwide reporting scheme required for all of the enterprise's foreign affiliates would cost more than $5 million to set up, and more than $2 million annually to maintain.  Brief for Petitioner in No. 92–1384, p. 44, n. 13; Nos. 325059 and 325061 (Super. Ct. Sacramento Cty., Aug. 20, 1987) (reprinted in App. to Pet. for Cert. in No. 92–1384, pp. A–27 to A–28).

group in the ordinary course of business.[12]   California's regulations, however, also provide that the Tax Board "shall consider the effort and expense required to obtain the necessary information" and, in "appropriate cases, such as when the necessary data cannot be developed from financial records maintained in the regular course of business," may accept "reasonable approximations."   Cal. Code of Regs., Title 18, § 25137–6(e)(1) (1985).   As the Court of Appeal comprehended, in determining Barclays' 1977 worldwide income, Barclays and the Tax Board "used these [latter] provisions and [made] computations based on reasonable approximations," 10 Cal. App. 4th, at 1756, 14 Cal. Rptr. 2d, at 545, thus allowing Barclays to avoid the large compliance costs of which it complains.[13]   Barclays has not shown that California's provision for "reasonable approximations" systematically "overtaxes" foreign corporations generally or BBI or Barcal in particular.

In sum, Barclays has not demonstrated that California's tax system in fact operates to impose inordinate compliance burdens on foreign enterprises.   Barclays' claim of unconstitutional discrimination against foreign commerce therefore fails.

## III

Barclays additionally argues that California's "reasonable approximations" method of reducing the compliance burden

---

[12] Under the regulations to which Barclays refers, a "unitary business with operations in foreign countries" may determine its worldwide income based upon either (1) "[a] profit and loss statement . . . for each foreign branch or corporation," Cal. Code of Regs., Title 18, § 25137–6(b)(1) (1985); (2) the "consolidated profit and loss statement prepared for the related corporations of which the unitary business is a member which is prepared for filing with the Securities and Exchange Commission," § 25137–6(b)(2); or (3) "the consolidated profit and loss statement prepared for reporting to shareholders and subject to review by an independent auditor," *ibid.*

[13] The California Court of Appeal additionally found that Barclays' actual compliance costs were "relatively modest" during the years just prior to those here at issue, ranging from $900 to $1,250 per annum, for BBI. See 10 Cal. App. 4th, at 1760, n. 9, 14 Cal. Rptr. 2d, at 548, n. 9.

is incompatible with due process. "Foreign multinationals," Barclays maintains, "remain at peril in filing their tax returns because there is no standard to determine what 'approximations' will be accepted." Brief for Petitioner in No. 92–1384, at 49. Barclays presents no substantive grievance concerning the treatment it has received, i. e., no example of an approximation rejected by the Tax Board as unreasonable. Barclays instead complains that "[t]he grant of standardless discretion itself violates due process," so that the taxpayer need not show "actual harm from arbitrary application." Ibid.

We note, initially, that "reasonableness" is a guide admitting effective judicial review in myriad settings, from encounters between the police and the citizenry, see Terry v. Ohio, 392 U. S. 1, 27 (1968) (Fourth Amendment permits police officer's limited search for weapons in circumstances where "reasonably prudent man . . . would be warranted in the belief that his safety or that of others was in danger" based upon "reasonable inferences . . . draw[n] from the facts in light of [officer's] experience"), to the more closely analogous federal income tax context. See, e. g., 26 U. S. C. § 162(a)(1) (allowing deductions for ordinary business expenses, including a "reasonable allowance for salaries or other compensation"); § 167(a) (permitting a "reasonable allowance" for wear and tear as a depreciation deduction); see also United States v. Ragen, 314 U. S. 513, 522 (1942) (noting that determinations "by reference to a standard of 'reasonableness' [are] not unusual under federal income tax laws").

We next observe that California's judiciary has construed the California law to curtail the discretion of California tax officials. See 10 Cal. App. 4th, at 1762, 14 Cal. Rptr. 2d, at 549 (the Tax Board must consider "regularly-maintained or other readily-accessibly corporate documents" in deciding whether the "cost and effort of producing [worldwide combined reporting] information" justifies submission of "reasonable approximations"). We note, furthermore, that California has afforded Barclays the opportunity "to clarify the

meaning of the regulation[s] by its own inquiry, or by resort to an administrative process." See *Hoffman Estates* v. *Flipside, Hoffman Estates, Inc.*, 455 U. S. 489, 498 (1982). Taxpayers, under the State's scheme, may seek "an advance determination" from the Tax Board regarding the tax consequences of a proposed course of action. Cal. Code of Regs., Title 18, § 25137–6(e)(2) (1985).

Rules governing international multijurisdictional income allocation have an inescapable imprecision given the complexity of the subject matter. See *Container Corp.*, 463 U. S., at 192 (allocation "bears some resemblance . . . to slicing a shadow").[14] Mindful that rules against vagueness are not "mechanically applied" but depend, in their application, on "the nature of the enactment," *Hoffman Estates*, 455 U. S., at 498, we hold that California's scheme does not transgress constitutional limitations in this regard, and that Barclays' due process argument is no more weighty than its claim of discrimination first placed under a Commerce Clause heading.

## IV

### A

Satisfied that California's corporate franchise tax is "proper and fair" as tested under *Complete Auto*'s guides,

---

[14] As noted by the California Court of Appeal, even the federal separate accounting scheme preferred by Barclays entails recourse to a standard "akin to reasonable approximation." 10 Cal. App. 4th 1742, 1763, 14 Cal. Rptr. 2d 537, 550 (1993). The Internal Revenue Code allows the Secretary of Treasury to "distribute, apportion, or allocate gross income, deductions, credits, or allowances" among a controlled group of businesses "if he determines that such distribution, apportionment, or allocation is necessary in order to prevent evasion of taxes or clearly to reflect the income" of such businesses. 26 U. S. C. § 482; see App. in No. 92–1384, p. A–829 (testimony of Barclays' expert witness that § 482 requires "reasonable approximation[s]" of arm's-length prices); *Peck* v. *Commissioner*, 752 F. 2d 469, 472 (CA9 1985) (under § 482, Internal Revenue Service determination of arm's-length prices will be sustained unless unreasonable, arbitrary, or capricious).

see *Container Corp.*, 463 U. S., at 184, we proceed to the "additional scrutiny" required when a State seeks to tax *foreign* commerce. *Id.*, at 185. First of the two additional considerations is "the enhanced risk of multiple taxation." *Ibid.*

In *Container Corp.*, we upheld application of California's combined reporting obligation to "foreign subsidiaries of *domestic* corporations," *id.*, at 193 (emphasis added), against a charge that such application unconstitutionally exposed those subsidiaries to a risk of multiple international taxation.[15] Barclays contends that its situation compels a different outcome, because application of the combined reporting obligation to foreign multinationals creates a "'more aggravated' risk . . . of double taxation." Brief for Petitioner in No. 92–1384, at 32, quoting Nos. 325059 and 325061 (Super. Ct. Sacramento Cty., Aug. 20, 1987) (reprinted in App. to Pet. for Cert. in No. 92–1384, p. A–26). Barclays rests its argument on the observation that "foreign multinationals typically have more of their operations and entities outside of the United States [compared to] domestic multinationals, which typically have a smaller share of their operations and entities outside of the United States." Brief for Petitioner in No. 92–1384, at 33.[16] As a result, a higher proportion of the income of a foreign multinational is subject to taxation by foreign sovereigns. This reality, Barclays concludes, means that for the foreign multinational, which must include all its foreign operations in the California combined reporting group, "the breadth of double taxation and the degree of burden on foreign commerce are greater than in the case of domestic multinationals." *Ibid.*

---

[15] We reserved judgment on whether an altered analysis would be required where the taxpayer was part of a foreign-based enterprise. See *Container Corp.*, 463 U. S., at 189, n. 26; *id.*, at 195, n. 32.

[16] To illustrate, Barclays points to its own operations: only 3 of the more than 220 entities in the Barclays Group did any business in the United States. Brief for Petitioner in No. 92–1384, at 33.

We do not question Barclays' assertion that multinational enterprises with a high proportion of income taxed by jurisdictions with wage rates, property values, and sales prices lower than California's face a correspondingly high risk of multiple international taxation. See *Container Corp.*, 463 U. S., at 187; cf. *id.*, at 199–200 (Powell, J., dissenting) (describing how formulary apportionment leads to multiple taxation). Nor do we question that foreign-based multinationals have a higher proportion of such income, on average, than do their United States counterparts. But *Container Corp.*'s approval of this very tax, in the face of a multiple taxation challenge, did not rest on any insufficiency in the evidence that multiple taxation might occur; indeed, we accepted in that case the taxpayer's assertion that multiple taxation in fact had occurred. *Id.*, at 187 ("[T]he tax imposed here, like the tax in *Japan Line,* has resulted in actual double taxation, in the sense that some of the income taxed without apportionment by foreign nations as attributable to appellant's foreign subsidiaries was also taxed by California as attributable to the State's share of the total income of the unitary business of which those subsidiaries are a part."); see also *id.*, at 187, n. 22.

*Container Corp.*'s holding on multiple taxation relied on two considerations: first, that multiple taxation was not the "inevitable result" of the California tax;[17] and, second, that the "alternativ[e] reasonably available to the taxing State" (*i. e.*, some version of the separate accounting/"arm's length"

---

[17] The Court stated: "[T]he double taxation in this case, although real, is not the 'inevitabl[e]' result of the California taxing scheme. . . . [W]e are faced with two distinct methods of allocating the income of a multinational enterprise. The 'arm's-length' approach divides the pie on the basis of formal accounting principles. The formula apportionment method divides the same pie on the basis of a mathematical generalization. Whether the combination of the two methods results in the same income being taxed twice or in some portion of income not being taxed at all is dependent solely on the facts of the individual case." *Container Corp.*, 463 U. S., at 188 (citation omitted).

approach), *id.*, at 188–189, "could not eliminate the risk of double taxation" and might in some cases enhance that risk. *Id.*, at 191.[18] We underscored that "even though most nations have adopted the arm's-length approach in its general outlines, the precise rules under which they reallocate income among affiliated corporations often differ substantially, and *whenever that difference exists, the possibility of double taxation also exists." Ibid.* (emphasis added); see also *id.*, at 192 ("California would have trouble avoiding multiple taxation even if it adopted the 'arm's-length' approach . . . .").

These considerations are not dispositively diminished when California's tax is applied to the components of foreign, as opposed to domestic, multinationals. Multiple taxation of such entities because of California's scheme is not "inevitable"; the existence *vel non* of actual multiple taxation of income remains, as in *Container Corp.*, dependent "on the facts of the individual case." *Id.*, at 188. And if, as we have held, adoption of a separate accounting system does not dispositively lessen the risk of multiple taxation of the income earned by foreign affiliates of *domestic*-owned corporations, we see no reason why it would do so in respect of the income earned by foreign affiliates of *foreign*-owned corporations. We refused in *Container Corp.* "to require California to give up one allocation method that sometimes results in double taxation in favor of another allocation method that also sometimes results in double taxation." *Id.*, at 193. The

---

[18] The Court's decision in *Container Corp.* effectively modified, for purposes of *income* taxation, the Commerce Clause multiple taxation inquiry described in *Japan Line, Ltd.* v. *County of Los Angeles*, 441 U. S. 434 (1979) (holding unconstitutional application of California's ad valorem property tax to cargo containers based in Japan and used exclusively in foreign commerce). In *Japan Line*, confronting a property tax on containers used as "instrumentalities of [foreign] commerce," not an income tax on companies, we said that a state tax is incompatible with the Commerce Clause if it "creates a substantial risk of international multiple taxation." *Id.*, at 451.

foreign domicile of the taxpayer (or the taxpayer's parent) is a factor inadequate to warrant retraction of that position.

Recognizing that multiple taxation of international enterprise may occur whatever taxing scheme the State adopts, JUSTICE O'CONNOR, dissenting in No. 92–1384, finds impermissible under "the [dormant] Foreign Commerce Clause" only double taxation that (1) burdens a foreign corporation in need of protection for lack of access to the political process, and (2) occurs "because [the State] does not conform to international practice." *Post*, at 336. But the image of a politically impotent foreign transactor is surely belied by the battalion of foreign governments that has marched to Barclays' aid, deploring worldwide combined reporting in diplomatic notes, *amicus* briefs, and even retaliatory legislation. See *infra*, at 324, n. 22; *post*, at 337. Indeed, California responded to this impressive political activity when it eliminated mandatory worldwide combined reporting. See *supra*, at 306. In view of this activity, and the control rein Congress holds, see *infra*, at 329–331, we cannot agree that "international practice" has such force as to dictate this Court's Commerce Clause jurisprudence. We therefore adhere to the precedent set in *Container Corp.*

## B

We turn, finally, to the question ultimately and most energetically presented: Did California's worldwide combined reporting requirement, as applied to Barcal, BBI, and Colgate, "impair federal uniformity in an area where federal uniformity is essential," *Japan Line*, 441 U. S., at 448; in particular, did the State's taxing scheme "preven[t] the Federal Government from 'speaking with one voice' in international trade"? *Id.*, at 453, quoting *Michelin Tire Corp.* v. *Wages*, 423 U. S., at 285.

### 1

Two decisions principally inform our judgment: first, this Court's 1983 determination in *Container Corp.*; and second, our decision three years later in *Wardair Canada Inc.* v.

*Florida Dept. of Revenue*, 477 U. S. 1 (1986). *Container Corp.* held that California's worldwide combined reporting requirement, as applied to domestic corporations with foreign subsidiaries, did not violate the "one voice" standard. *Container Corp.* bears on Colgate's case, but not Barcal's or BBI's, to this extent: "[T]he tax [in *Container Corp.*] was imposed, not on a foreign entity . . . , but on a domestic corporation." 463 U. S., at 195.[19]  Other factors emphasized in *Container Corp.*, however, are relevant to the complaints of all three taxpayers in the consolidated cases now before us.[20]  Most significantly, the Court found no "specific indications of congressional intent" to preempt California's tax:

> "First, there is no claim here that the federal tax statutes themselves provide the necessary pre-emptive force.  Second, although the United States is a party to a great number of tax treaties that require the Federal Government to adopt some form of 'arm's-length' analysis in taxing the domestic income of multinational enterprises, that requirement is generally waived with respect to the taxes imposed by each of the contracting nations on its own domestic corporations. . . . Third, the tax treaties into which the United States has entered do not generally cover the taxing activities of subnational governmental units such as States, and in none of the

---

[19] *Container Corp.* noted:

"We recognize that the fact that legal incidence of a tax falls on a corporation whose formal corporate domicile is domestic might be less significant in the case of a domestic corporation that was owned by foreign interests.  We need not decide here whether such a case would require us to alter our analysis." 463 U. S., at 195, n. 32.

[20] *Container Corp.* observed that "the tax here does not create an *automatic* 'asymmetry' . . . in international taxation," *id.*, at 194–195, quoting *Japan Line*, 441 U. S., at 453—*i. e.*, it does not inevitably lead to double taxation.  See *supra*, at 319–320, and n. 17.  Furthermore, Colgate, Barcal, and BBI are "without a doubt amenable to be taxed in California in one way or another," and "the amount of tax [they] pa[y] is much more the function of California's tax rate than of its allocation method." 463 U. S., at 195.

treaties does the restriction on 'non-arm's-length' methods of taxation apply to the States. Moreover, the Senate has on at least one occasion, in considering a proposed treaty, attached a reservation declining to give its consent to a provision in the treaty that would have extended that restriction to the States. Finally, . . . Congress has long debated, but has not enacted, legislation designed to regulate state taxation of income." *Id.*, at 196–197 (footnotes and internal quotation marks omitted).

The Court again confronted a "one voice" argument in *Wardair Canada Inc.* v. *Florida Dept. of Revenue,* 477 U. S. 1 (1986), and there rejected a Commerce Clause challenge to Florida's tax on the sale of fuel to common carriers, including airlines. Air carriers were taxed on all aviation fuel purchased in Florida, without regard to the amount the carrier consumed within the State or the amount of its in-state business. The carrier in *Wardair,* a Canadian airline that operated charter flights to and from the United States, conceded that the challenged tax satisfied the *Complete Auto* criteria and entailed no threat of multiple international taxation. Joined by the United States as *amicus curiae,* however, the carrier urged that Florida's tax "threaten[ed] the ability of the Federal Government to 'speak with one voice.'" 477 U. S., at 9. There is "a federal policy," the carrier asserted, "of reciprocal tax exemptions for aircraft, equipment, and supplies, including aviation fuel, that constitute the instrumentalities of international air traffic"; this policy, the carrier argued, "represents the statement that the 'one voice' of the Federal Government wishes to make," a statement "threatened by [Florida's tax]." *Ibid.*

This Court disagreed, observing that the proffered evidence disclosed no federal policy of the kind described and indeed demonstrated that the Federal Government intended to *permit* the States to impose sales taxes on aviation fuel. The international convention and resolution and more than 70 bilateral treaties on which the carrier relied to show a

United States policy of tax exemption for the instrumentalities of international air traffic, the Court explained, in fact indicated far less: "[W]hile there appears to be an international *aspiration* on the one hand to eliminate all impediments to foreign air travel—including taxation of fuel—the *law* as it presently stands acquiesces in taxation of the sale of that fuel by political subdivisions of countries." *Id.*, at 10 (emphasis in original). Most of the bilateral agreements prohibited the Federal Government from imposing national taxes on aviation fuel used by foreign carriers, but none prohibited the States or their subdivisions from taxing the sale of fuel to foreign airlines. The Court concluded that "[b]y negative implication arising out of [these international accords,] the United States has at least acquiesced in state taxation of fuel used by foreign carriers in international travel," and therefore upheld Florida's tax. *Id.*, at 12.

In both *Wardair* and *Container Corp.*, the Court considered the "one voice" argument only after determining that the challenged state action was otherwise constitutional. An important premise underlying both decisions[21] is this: Congress may more passively indicate that certain state practices do *not* "impair federal uniformity in an area where federal uniformity is essential," *Japan Line*, 441 U. S., at 448; it need not convey its intent with the unmistakable clarity required to permit state regulation that discriminates against interstate commerce or otherwise falls short under *Complete Auto* inspection. See, *e. g.*, *Maine* v. *Taylor*, 477 U. S. 131, 139 (1986) (requiring an "unambiguous indication of congressional intent" to insulate "otherwise invalid state legislation" from judicial dormant Commerce Clause scru-

---

[21] See also *Itel Containers Int'l Corp.* v. *Huddleston*, 507 U. S. 60, 75 (1993) (upholding Tennessee's tax on lease of cargo containers used exclusively in international shipping; because tax in question was not among those proscribed by "various conventions, statutes, and regulations[,] . . . the most rational inference to be drawn is that th[e] tax, one quite distinct from the general class of import duties, is permitted").

tiny); *Northwest Airlines, Inc.* v. *County of Kent,* 510 U. S. 355, 373, and n. 19 (1994) (same).

### 2

As in *Container Corp.* and *Wardair,* we discern no "specific indications of congressional intent" to bar the state action here challenged. Our decision upholding California's franchise tax in *Container Corp.* left the ball in Congress' court; had Congress, the branch responsible for the regulation of foreign commerce, see U. S. Const., Art. I, § 8, cl. 3, considered nationally uniform use of separate accounting "essential," *Japan Line,* 441 U. S., at 448, it could have enacted legislation prohibiting the States from taxing corporate income based on the worldwide combined reporting method. In the 11 years that have elapsed since our decision in *Container Corp.,* Congress has failed to enact such legislation.

In the past three decades—both before and after *Container Corp.*—Congress, aware that foreign governments were displeased with States' worldwide combined reporting requirements,[22] has on many occasions studied state taxation

---

[22] The governments of many of our trading partners have expressed their strong disapproval of California's method of taxation, as demonstrated by the *amici* briefs in support of Barclays from the Government of the United Kingdom, and from the Member States of the European Communities (Belgium, Denmark, France, Germany, Greece, Ireland, Italy, Luxembourg, the Netherlands, Portugal, and Spain) and the governments of Australia, Austria, Canada, Finland, Japan, Norway, Sweden, and Switzerland. Barclays has also directed our attention to a series of diplomatic notes similarly protesting the tax. See, *e. g.,* App. in No. 92–1384, at A–92 to A–123, A–127 to A–128, A–131 to A–138; see also p. A–603 (letter from Secretary of State George Schultz to California Governor Deukmejian (Jan. 30, 1986)) ("The Department of State has received diplomatic notes complaining about state use of the worldwide unitary method of taxation from virtually every developed country in the world."). The British Parliament has gone further, enacting retaliatory legislation that would, if implemented, tax United States corporations on dividends they receive from their United Kingdom subsidiaries. See Finance Act 1985, pt. 2, ch. 1, § 54, and sch. 13, ¶ 5 (Eng.), reenacted in Income and Corporation Taxes Act 1988, pt. 18, ch. 3, § 812 and sch. 30, ¶¶ 20, 21 (Eng.).

of multinational enterprises.[23] The numerous bills intro-
duced have varied, but all would have prohibited the Califor-
nia reporting requirement here challenged. One group of
bills would have prohibited States using combined reporting
from compelling inclusion, in the combined reporting group,
of corporate affiliates whose income was derived substan-

---

[23] Pursuant to § 201 of Pub. L. 86–272, 73 Stat. 556, in which Congress
undertook to "make full and complete studies of all matters pertaining to
the taxation . . . of interstate commerce . . . by the States," the House
Committee on the Judiciary held extensive hearings on the (primarily do-
mestic) implications of alternative tax apportionment schemes. See State
Income Taxation of Mercantile and Manufacturing Corporations: Hearings
before the Special Subcommittee on State Taxation of Interstate Com-
merce of the House Committee on the Judiciary, 87th Cong., 1st Sess.
(1961). The Subcommittee's comprehensive final Report recommended,
*inter alia*, that "formula apportionment be used as the sole method of
dividing income among the States for tax purposes," State Taxation of
Interstate Commerce: Report of the Special Subcommittee on State Taxa-
tion of Interstate Commerce, House Committee on the Judiciary, H. R.
Rep. No. 952, 89th Cong., 1st Sess., 1144 (1965), and that States be required
to refrain from taxing any foreign income exempt from federal taxation.
*Id.*, at 1135. Congress, however, enacted no legislation embodying these
recommendations.

Congress continued to study and debate this matter over the next two
decades. See Interstate Taxation Act, H. R. 11798 and Companion Bills:
Hearings before the Special Subcommittee on State Taxation of Interstate
Commerce of the House Committee on the Judiciary, 89th Cong., 2d Sess.
(1966); State Taxation of Interstate Commerce: Hearings before the Sub-
committee on State Taxation of Interstate Commerce of the Senate Com-
mittee on Finance, 93d Cong., 1st Sess. (1973); Interstate Taxation, S. 1273:
Hearings before the Senate Committee on the Judiciary, 95th Cong., 1st
and 2d Sess. (1977–1978); Recommendations of the Task Force on Foreign
Source Income, House Committee on Ways and Means, 95th Cong., 1st
Sess. (Comm. Print 1977); State Taxation of Foreign Source Income, 1980:
Hearings on H. R. 5076 before the House Committee on Ways and Means,
96th Cong., 2d Sess. (1980); State Taxation of Interstate Commerce and
Worldwide Corporate Income, Hearings on S. 983 and S. 1688 before the
Subcommittee on Taxation and Debt Management Generally of the Senate
Committee on Finance, 96th Cong., 2d Sess. (1980); Unitary Taxation:
Hearing before the Subcommittee on International Economic Policy of the
Senate Committee on Foreign Relations, 98th Cong., 2d Sess. (1984).

tially from sources outside the United States.[24]    Another set would have barred the States from requiring taxpayers to report any income that was not subject to *federal* income tax;[25] thus, "foreign source income" of foreign corporations ordinarily would not be reported.    See *supra,* at 306, n. 5. None of these bills, however, was enacted.

The history of Senate action on a United States/United Kingdom tax treaty, to which we referred in *Container Corp.,* see 463 U. S., at 196, reinforces our conclusion that Congress implicitly has *permitted* the States to use the worldwide combined reporting method.    As originally negotiated by the President, this treaty—known as the Convention for Avoidance of Double Taxation and the Prevention of Fiscal Evasion with Respect to Taxes on Income and Capital Gains—would have precluded States from requiring that United Kingdom-controlled corporate taxpayers use combined reporting to compute their state income.    See Art. 9(4), 31 U. S. T. 5670, 5677, T. I. A. S. No. 9682.[26]    The Senate

---

[24] See, *e. g.,* S. 1245, 93d Cong., 1st Sess. (1973); S. 2173, 95th Cong., 1st Sess. (1978); H. R. 6146, 98th Cong., 2d Sess. (1984); H. R. 4940, 98th Cong., 2d Sess. (1984); S. 3061, 98th Cong., 2d Sess. (1984); S. 1974, 99th Cong., 1st Sess. (1985); H. R. 3980, 99th Cong., 1st Sess. (1986); S. 1139, 101st Cong., 1st Sess. (1989); S. 1775, 102d Cong., 1st Sess. (1991).

[25] See, *e. g.,* H. R. 11798, 89th Cong., 1st Sess. (1965); H. R. 5076, 96th Cong., 1st Sess. (1979); S. 1688, 96th Cong., 1st Sess. (1979); H. R. 8277, 96th Cong., 2d Sess. (1980); H. R. 1983, 97th Cong., 1st Sess. (1981); H. R. 2918, 98th Cong., 1st Sess. (1983); S. 1225, 98th Cong., 1st Sess. (1983); S. 1113, 99th Cong., 1st Sess. (1985).

[26] Article 9(4) would have provided:

"Except as specifically provided in this Article, in determining the tax liability of an enterprise doing business in a Contracting State, or *in a political subdivision or local authority* of a Contracting State, such Contracting State, *political subdivision, or local authority* shall not take into account the income, deductions, receipts, or outgoings of a related enterprise of the other Contracting State or of an enterprise of any third State related to any enterprise of the other Contracting State." (Emphasis added.)

rejected this version of the treaty, 124 Cong. Rec. 18670 (1978), and ultimately ratified the agreement, *id.*, at 19076, "subject to the reservation that the provisions of [Article 9(4)] . . . shall not apply to any political subdivision or local authority of the United States," *id.*, at 18416. The final version of the treaty prohibited state tax discrimination against British nationals, Art. 2(4), 31 U. S. T. 5671; Art. 24, *id.*, at 5687–5688,[27] but did not require States to use separate accounting or water's edge apportionment of income, *id.*, at 5709.

Given these indicia of Congress' willingness to tolerate States' worldwide combined reporting mandates, even when those mandates are applied to foreign corporations and domestic corporations with foreign parents, we cannot conclude that "the foreign policy of the United States—whose nuances . . . are much more the province of the Executive Branch and Congress than of this Court—is [so] seriously threatened," *Container Corp.*, 463 U. S., at 196, by California's practice as to warrant our intervention.[28] For this reason, Barclays' and its *amici's* argument that California's worldwide combined reporting requirement is unconstitutional because it is

---

[27] Article 2(4) provides: "For the purpose of Article 24 (Non-discrimination), this Convention shall also apply to taxes of every kind and description imposed by each Contracting State, or by its political subdivisions or local authorities."

[28] That "federal law has long embodied a *preference* for the arm's length method, in the sense that this method is used in computing the federal income tax liability of multinational corporations," does not render a State's use of a different method unconstitutional, as the Solicitor General points out. Brief for United States as *Amicus Curiae* 17–18 (emphasis in original), citing *Mobil Oil Corp.* v. *Commissioner of Taxes of Vt.*, 445 U. S. 425, 448 (1980) ("Concurrent federal and state taxation of income, of course, is a well-established norm. Absent some explicit directive from Congress, we cannot infer that treatment of foreign income at the federal level mandates identical treatment by the States.").

likely to provoke retaliatory action by foreign governments[29] is directed to the wrong forum. The judiciary is not vested with power to decide "how to balance a particular risk of retaliation against the sovereign right of the United States as a whole to let the States tax as they please." *Id.*, at 194.

### 3

To support its argument that California's worldwide combined reporting method impermissibly interferes with the Federal Government's ability to "speak with one voice," and to distinguish *Container Corp.*, Colgate points to a series of Executive Branch actions, statements, and *amicus* filings, made both before and after our decision in *Container Corp.*[30] Colgate contends that, taken together, these Executive pronouncements constitute a "clear federal directive" proscribing States' use of worldwide combined reporting. Brief for Petitioner in No. 92–1839, p. 36, quoting *Container Corp.*, 463 U. S., at 194.

The *Executive* statements to which Colgate refers, however, cannot perform the service for which Colgate would

---

[29] See, *e. g.*, Brief for Petitioner in No. 92–1384, at 25–28; Brief for Government of United Kingdom as *Amicus Curiae* in No. 92–1384, at 19–24; Brief for Member States of European Communities et al. as *Amici Curiae* in No. 92–1384, pp. 16–17.

[30] Colgate cites, for example, President Reagan's decision to introduce legislation confining States to a water's edge method, State Taxation of Multinational Corporations, 21 Weekly Comp. of Pres. Doc. 1368 (Nov. 8, 1985) (statement of President Reagan); letters sent by members of the Reagan and Bush administrations to the Governor of California and the Chairman of the Senate Finance Committee, expressing the Federal Government's opposition to worldwide combined reporting, App. in No. 92–1839, pp. 9–27; and Department of Justice *amicus* briefs filed in this Court, arguing that the worldwide combined reporting method violates the dormant Commerce Clause, *e. g.*, Brief for United States as *Amicus Curiae* in *Chicago Bridge & Iron Co.* v. *Caterpillar Tractor Co.*, O. T. 1982, No. 81–349, cert. dism'd, 463 U. S. 1220 (1983); Brief for United States as *Amicus Curiae* in *Barclays Bank PLC* v. *Franchise Tax Bd. of Cal.*, O. T. 1992, No. 92–212, cert. denied, 506 U. S. 870 (1992).

enlist them. The Constitution expressly grants Congress, not the President, the power to "regulate Commerce with foreign Nations." U. S. Const., Art. I, §8, cl. 3. As we have detailed, *supra*, at 324–327, and nn. 23–27, Congress has focused its attention on this issue, but has refrained from exercising its authority to prohibit state-mandated worldwide combined reporting. That the Executive Branch proposed legislation to outlaw a state taxation practice, but encountered an unreceptive Congress, is not evidence that the practice interfered with the Nation's ability to speak with one voice, but is rather evidence that the preeminent speaker decided to yield the floor to others. Cf. *Itel Containers Int'l Corp.* v. *Huddleston,* 507 U. S. 60, 81 (1993) (SCALIA, J., concurring in part and concurring in judgment) ("[The President] is better able to decide than we are which state regulatory interests should currently be subordinated to our national interest in foreign commerce. Under the Constitution, however, neither he nor we were to make that decision, but only Congress.").

Congress may "delegate very large grants of its power over foreign commerce to the President," who "also possesses in his own right certain powers conferred by the Constitution on him as Commander-in-Chief and as the Nation's organ in foreign affairs." *Chicago & Southern Air Lines, Inc.* v. *Waterman S. S. Corp.,* 333 U. S. 103, 109 (1948). We need not here consider the scope of the President's power to preempt state law pursuant to authority delegated by a statute or a ratified treaty; nor do we address whether the President may displace state law pursuant to legally binding executive agreements with foreign nations[31] made "in the absence of either a congressional grant or denial of authority, [where] he can only rely upon his own independent powers." *Youngstown Sheet & Tube Co.* v. *Sawyer,* 343 U. S. 579, 637 (1952) (Jackson, J., concurring). The Executive Branch ac-

---

[31] See *United States* v. *Belmont,* 301 U. S. 324, 331–332 (1937).

tions—press releases, letters, and *amicus* briefs—on which
Colgate here relies are merely precatory. Executive Branch
communications that express federal policy but lack the force
of law cannot render unconstitutional California's otherwise
valid, congressionally condoned, use of worldwide combined
reporting.[32]

*   *   *

The Constitution does " 'not make the judiciary the over-
seer of our government.' " *Dames & Moore* v. *Regan*, 453
U. S. 654, 660 (1981), quoting *Youngstown Sheet & Tube Co.* v.
*Sawyer*, 343 U. S., at 594 (Frankfurter, J., concurring). Hav-
ing determined that the taxpayers before us had an adequate
nexus with the State, that worldwide combined reporting led
to taxation which was fairly apportioned, nondiscriminatory,
fairly related to the services provided by the State, and that
its imposition did not result inevitably in multiple taxation,

---

[32] The Solicitor General suggests that when a court analyzes "whether a
state tax impairs the federal government's ability to speak with one voice
. . . the statements of executive branch officials are entitled to substantial
evidentiary weight," Brief for United States as *Amicus Curiae* 19, but he
argues that the constitutionality of a State's taxing practice must be as-
sessed according to the federal policy, if any, in effect at the time the
challenged taxes were assessed. He asserts that federal officials had not
articulated a policy opposing use by the States of worldwide combined
reporting prior to the mid-1980's, and urges the Court to affirm the judg-
ments below on the ground that California's use of worldwide combined
reporting was not unconstitutional during the years here at issue, even if
it became unconstitutional in later years (a question on which he takes no
position, see Tr. of Oral Arg. 38–41). Colgate, on the other hand, suggests
that the relevant time frame is "when the tax is definitively enforced by
the state taxing authority, through judicial proceedings if necessary, not
when the tax technically accrues under state law," Reply Brief for Peti-
tioner in No. 92–1839, p. 7, and argues in the alternative that a federal
policy opposing combined worldwide reporting had been established as of
1970–1973, *id.*, at 9. We need not resolve this dispute, because we have
concluded that the Executive statements criticizing States' use of world-
wide combined reporting do not, in light of Congress' acquiescence in the
States' actions, authorize judicial intervention here.

we leave it to Congress—whose voice, in this area, is the Nation's—to evaluate whether the national interest is best served by tax uniformity, or state autonomy.   Accordingly, the judgments of the California Court of Appeal are

*Affirmed.*

JUSTICE BLACKMUN, concurring.

Last Term, in *Itel Containers Int'l Corp.* v. *Huddleston,* 507 U. S. 60, 85 (1993) (BLACKMUN, J., dissenting), I expressed my disagreement with the Court's willingness, in applying the "one voice" test, to "infe[r] permission for [a] tax from Congress' supposed failure to prohibit it."   See also *Wardair Canada Inc.* v. *Florida Dept. of Revenue,* 477 U. S. 1, 18 (1986) (BLACKMUN, J., dissenting).   I accordingly would not rely in the present cases on congressional inaction to conclude that "Congress implicitly has *permitted* the States to use the worldwide combined reporting method."   *Ante,* at 326.   Nevertheless, because today's holding largely is controlled by *Container Corp. of America* v. *Franchise Tax Bd.,* 463 U. S. 159 (1983), and because California's corporate franchise tax does not directly burden the instrumentalities of foreign commerce, see *Itel, supra; Wardair, supra;* and *Japan Line, Ltd.* v. *County of Los Angeles,* 441 U. S. 434 (1979), I agree that the tax does not "impair federal uniformity in an area where federal uniformity is essential," *id.,* at 448.   I therefore join the opinion of the Court.

JUSTICE SCALIA, concurring in part and concurring in the judgment.

I concur in the judgment of the Court and join all of its opinion except Part IV–B, which disposes of the petitioners' "negative" Foreign Commerce Clause argument by applying the "speak with one voice" test of *Japan Line, Ltd.* v. *County of Los Angeles,* 441 U. S. 434 (1979).

As I stated last Term in *Itel Containers Int'l Corp.* v. *Huddleston,* 507 U. S. 60, 78 (1993) (opinion concurring in part

and concurring in judgment), "I will enforce a self-executing, 'negative' Commerce Clause in two circumstances: (1) against a state law that facially discriminates against interstate [or foreign] commerce, and (2) against a state law that is indistinguishable from a type of law previously held unconstitutional by this Court." *Id.*, at 78–79 (footnote omitted). Absent one of these circumstances, I will permit the States to employ whatever means of taxation they choose insofar as the Commerce Clause is concerned. Neither circumstance exists here, and the California tax therefore survives Commerce Clause attack.

I am not sure that the Court's opinion today, which requires no more than legislative inaction to establish that "Congress implicitly has *permitted*" the States to impose a particular restriction on foreign commerce, *ante*, at 326, will prove much different from my approach in its consequences. It is, moreover, an unquestionable improvement over *Itel:* whereas the "speak with one voice" analysis of that opinion gave the power to determine the constitutionality of a state law to the Executive Branch, see 507 U. S., at 80 (SCALIA, J., concurring in part and concurring in judgment), today's opinion restores the power to Congress—albeit in a form that strangely permits it to be exercised by silence.

JUSTICE O'CONNOR, with whom JUSTICE THOMAS joins, concurring in the judgment in part and dissenting in part.

I joined Justice Powell in dissent in *Container Corp. of America* v. *Franchise Tax Bd.*, 463 U. S. 159 (1983), and I continue to think the Court erred in upholding California's use of worldwide combined reporting in taxing the income of a domestic-based corporate group. But because the State and private parties have justifiably relied on the constitutionality of taxing such corporations, and Congress has not seen fit to override our decision, I agree with the Court that *Container Corp.* should not be overruled, cf. *Quill Corp.* v. *North Dakota*, 504 U. S. 298, 318–319 (1992), and that it

resolves the constitutional challenge raised by Colgate-Palmolive. I therefore concur in the judgment in No. 92–1839. Barclays Bank, on the other hand, is a *foreign*-based parent company of a multinational corporate group, and our holding in *Container Corp.* expressly does not extend to this situation. See 463 U. S., at 189, n. 26, and 195, n. 32. In my view, the California tax cannot constitutionally be applied to foreign corporations. I therefore respectfully dissent in No. 92–1384.

A state tax on interstate commerce must meet four requirements under our negative Commerce Clause precedents: the tax must be on an activity with a substantial nexus to the taxing State, it must be fairly apportioned, it must not discriminate against interstate commerce, and it must be fairly related to the services provided by the State. *Complete Auto Transit, Inc.* v. *Brady*, 430 U. S. 274, 279 (1977). Substantially for the reasons explained by the Court, see *ante,* at 311–314, I agree that imposition of the California tax complies with the four *Complete Auto* factors. (I also agree that California's practice of accepting "reasonable approximations" of the statutorily required financial data does not violate due process. See *ante,* at 314–316.) A state tax on *foreign* commerce, however, must satisfy two additional inquiries: "first, whether the tax, notwithstanding apportionment, creates a substantial risk of international multiple taxation, and, second, whether the tax prevents the Federal Government from 'speaking with one voice when regulating commercial relations with foreign governments.' If a state tax contravenes *either* of these precepts, it is unconstitutional under the Commerce Clause." *Japan Line, Ltd.* v. *County of Los Angeles*, 441 U. S. 434, 451 (1979) (emphasis added).

I am in general agreement with the Court, see *ante,* at 320–329, that the second *Japan Line* factor—the purported need for federal uniformity—does not prevent the use of worldwide combined reporting in taxing foreign corpora-

tions. The Congress, not the Executive or the Judiciary, has been given the power to regulate commerce. U. S. Const., Art. I, § 8, cl. 3. The Legislature has neither approved nor disapproved the California tax. Although in such circumstances courts have the power to scrutinize taxes for consistency with our negative Commerce Clause jurisprudence, this determination should be made on the basis of the objective factors outlined in *Complete Auto* (and, in the foreign commerce context, the multiple taxation analysis discussed in *Japan Line*), not statements made and briefs filed by officials in the Executive Branch. Cf. *Itel Containers Int'l Corp.* v. *Huddleston*, 507 U. S. 60, 80–81 (1993) (SCALIA, J., concurring in part and concurring in judgment). Indeed, the inconsistent positions taken by the Solicitor General in the course of Barclays' challenge to the California tax illustrate the perils of resting constitutional determinations on such "evidence." Compare Brief for United States as *Amicus Curiae* 21–24 (arguing that the California tax was constitutionally applied to Barclays during the tax years in question), with Brief for United States as *Amicus Curiae* in *Barclays Bank* v. *Franchise Tax Board*, O. T. 1992, No. 92–212, pp. 9–16 (arguing that the imposition of the California tax on Barclays was unconstitutional).

But I cannot agree with the Court's resolution of the other *Japan Line* factor—the need to avoid international multiple taxation. See *ante*, at 316–320. Barclays does 98% of its business in countries other than the United States. California, through application of worldwide combined reporting, taxes some of that income. The trial court found as a fact that "[t]here is a definite risk of, as well as actual double taxation here." App. to Pet. for Cert. in No. 92–1384, p. A–25. This double taxation occurs because California has adopted a taxing system that is inconsistent with the taxing method used by foreign taxing authorities. California's formula assigns a higher proportion of income to jurisdictions where wage rates, property values, and sales prices are

higher; to the extent that California is such a jurisdiction (and it usually will be) the formula inherently leads to double taxation. And whenever the three factors are higher in California, the State will tax income under its formula that already has been taxed by another country under accepted international practice.

In *Container Corp.*, we recognized that the California tax "ha[d] resulted in actual double taxation . . . stem[ming] from a serious divergence in the taxing schemes adopted by California and the foreign taxing authorities," and that "the taxing method adopted by those foreign taxing authorities is consistent with accepted international practice." 463 U. S., at 187. We nevertheless held that the tax did not violate the *Japan Line* principle. Two of the factors on which we relied—that the tax was on income rather than property, and that the multiple taxation was not "inevitable"—carry no more force today than they did 11 Terms ago, see 463 U. S., at 198–201 (Powell, J., dissenting), but they are present here as well.

We also relied on a third ground to distinguish the tax upheld in *Container Corp.* from the tax invalidated in *Japan Line:* "[T]he tax here falls, not on the foreign owners of an instrumentality of foreign commerce, but on a corporation domiciled and headquartered in the United States. We specifically left open in *Japan Line* the application of that case to 'domestically owned instrumentalities engaged in foreign commerce,' and . . . this case falls clearly within that reservation." 463 U. S., at 188–189, quoting *Japan Line, supra,* at 444, n. 7 (citation omitted). In a footnote, we continued: "We have no need to address in this opinion the constitutionality of [the California tax] with respect to state taxation of domestic corporations with foreign parents or foreign corporations with either foreign parents or foreign subsidiaries." 463 U. S., at 189, n. 26; see also *id.,* at 195, and n. 32. As the Court recognizes, *ante,* at 317, and n. 15, Barclays' challenge to the California tax therefore presents the question we ex-

pressly left open in *Container Corp.:* does it make a constitutional difference that the multiple taxation resulting from California's use of worldwide combined reporting falls on a foreign corporation rather than a domestic one? In my view, the answer is yes.

*Japan Line* teaches that where the instrumentality of commerce—and analogously, the corporate domicile—is foreign, the multiple taxation resulting from a state taxing scheme may violate the Commerce Clause even though the same tax would be constitutional as applied to a domestic corporation. 441 U. S., at 447–448. When worldwide combined reporting is applied to American corporate groups with foreign affiliates, as in *Container Corp.*, income attributable to those foreign companies will be taxed by California, even though they are also subject to tax in foreign countries. But in such cases the incidence of the tax falls on the domestic parent corporation—a corporation subject to full taxation in the United States notwithstanding the source of its income. When the California tax is applied to a foreign corporate group with both domestic and foreign affiliates, some of the income of the foreign companies will also be taxed by California. The incidence of the tax in such cases falls on a *foreign* corporation, even though the United States (and its subnational governments) is entitled to tax only the income earned domestically.

In my view, the States are prohibited (absent express congressional authorization) by the Foreign Commerce Clause from adopting a system of taxation that, because it does not conform to international practice, results in multiple taxation of foreign corporations. It may be that such a rule "leave[s] California free to discriminate against a Delaware corporation in favor of an overseas corporation," *Container Corp.*, 463 U. S., at 203 (Powell, J., dissenting), but the reason for this differential treatment is obvious. Domestic taxpayers have access to the political process, at both the state and national levels, that foreign taxpayers simply do not enjoy.

If California's tax results in intolerable double taxation of domestic corporations, those companies can seek redress through the normal channels. Cf. *Minnesota* v. *Clover Leaf Creamery Co.*, 449 U. S. 456, 473, n. 17 (1981); *Raymond Motor Transp., Inc.* v. *Rice*, 434 U. S. 429, 444, n. 18 (1978). It is all too easy, however, for the state legislature to fill the State's coffers at the expense of outsiders.

Most of the United States' trading partners have objected to California's use of worldwide combined reporting. See Démarche from Danish Embassy, on behalf of Governments of European Community (Mar. 26, 1993) ("The views of the EC Member States on worldwide unitary taxation are well known to the United States Government. All Member States have expressed their strong opposition to [the California] tax in a number of diplomatic communiques to the United States Government from 1980 to the present date"); Démarche from Belgian Embassy, on behalf of Governments of Member States of European Community and of Australia, Austria, Canada, Finland, Japan, Norway, Sweden, and Switzerland (Sept. 23, 1993). At least one country has already enacted retaliatory legislation. See Brief for Government of United Kingdom as *Amicus Curiae* 19–23. Moreover, the possibility of multiple taxation undoubtedly deters foreign investment in this country. See Brief for Member States of European Communities et al. as *Amici Curiae* 14–16. These adverse consequences, which affect the Nation as a whole, result solely from California's refusal to conform its taxing practices to the internationally accepted standard.

Unlike the Court, see *ante,* at 319, I would not dismiss these difficulties solely by relying on our observation in *Container Corp.* that "it would be perverse, simply for the sake of avoiding double taxation, to require California to give up one allocation method that sometimes results in double taxation in favor of another allocation method that also sometimes results in double taxation." 463 U. S., at 193. In addition to being factually incorrect, see *id.,* at 199, n. 1 (Powell, J.,

dissenting), our discussion of alternatives in *Container Corp.* proceeded from the well-established proposition that States need not conform their taxing practices to those of their neighbors, at least so far as domestic commerce is concerned. See, *e. g., Moorman Mfg. Co.* v. *Bair,* 437 U. S. 267, 277–281 (1978). Multiple taxation of domestic companies is avoided, to the extent necessary, by the fair apportionment requirement. See *Container Corp., supra,* at 185; *General Motors Corp.* v. *Washington,* 377 U. S. 436, 440 (1964).

But in *Japan Line* we squarely rejected the argument that the same principle applies to taxes imposed on foreign-owned instrumentalities:

> "[N]either this Court nor this Nation can ensure full apportionment when one of the taxing entities is a foreign sovereign. If an instrumentality of commerce is domiciled abroad, the country of domicile may have the right, consistently with the custom of nations, to impose a tax on its full value. If a State should seek to tax the same instrumentality on an apportioned basis, multiple taxation inevitably results. . . . Due to the absence of an authoritative tribunal capable of ensuring that the aggregation of taxes is computed on no more than one full value, a state tax, even though 'fairly apportioned' to reflect an instrumentality's presence within the State, may subject foreign commerce to the risk of a double tax burden to which [domestic] commerce is not exposed, and which the commerce clause forbids." 441 U. S., at 447–448 (footnote and internal quotation marks omitted).

In my view, the risk of multiple taxation created by California's use of worldwide combined reporting—a risk that has materialized with respect to Barclays—is sufficient to render the California tax constitutionally infirm. I therefore respectfully dissent from the Court's conclusion to the contrary.